Sulvan **BOWLING, Jr., and, Barbara Bowling, Appellants–Plaintiffs,**

v.

Joyce **POOLE, Appellee–Defendant.**

No. 69A01–0105–CV–173.

Court of Appeals of Indiana.

Oct. 10, 2001.

Joseph A. Colussi, Madison, IN, Attorney for Appellants.

Larry L. Eaton, Versailles, IN, Attorney for Appellee.

## OPINION

BAKER, Judge.

Once again, our courts are called upon to interpret the order of preference for the location of boundaries in a real property dispute. Appellants-plaintiffs Sulvan Bowling, Jr., and Barbara Bowling (collectively, the Bowlings) appeal the trial court's judgment denying their contract claim against appellee-defendant Joyce Poole. They claim that there was no mutual mistake of fact in the formation of the-sale contract and that the description of the land was adequate and unambiguous.

## FACTS[1]

This case arises from a real estate transaction between two neighbors who owned adjoining farms in Ripley County. The Bowlings owned a 125–acre farm to the south and east of Poole's 37–acre farm. According to the Bowlings, sometime during the spring of 1998, Poole stopped at the Bowlings' farm and told Barbara that she was thinking about selling her farm. Barbara told Poole that she would be interested in buying Poole's farm.[2] Several days later, Poole telephoned the Bowlings, asking that Barbara come to Poole's farm and make an offer. During the telephone conversation, Poole remarked that she was not sure whether she would sell the front tract or the back tract of the property, but that she would sell the house.

Barbara examined Poole's property and asked Poole to name her price. Afterward, Poole telephoned Barbara once more, this time offering to sell only the unimproved, eastern tract adjoining the Bowlings' farm. Poole said that she wanted to keep her house and a surrounding tract of improved land. Poole offered the eastern tract for $15,000.

At trial, Poole saw the meeting with Barbara from a different perspective. Poole testified about the amount of land she considered selling and the price: "We kind of, [i]t was kind of vague, what we talked about were the three acres that I knew, and I said that there were three acres over there that would be real nice for you. . . . So anyway, then she said well I'm interested in the other acreage, well

---

1. We would like to thank counsel for their excellent briefs and participation in the oral argument that took place at the Orange County Circuit Court on September 20, 2001. We also express our appreciation to the Honorable Larry Blanton, judge of the Orange Circuit Court, and his staff, along with the County Sheriff's Department for their security efforts. We extend our thanks to the students and teachers who attended the argument, and we appreciated their participation in the question and answer session in connection with our centennial celebration.

2. Poole, to the contrary, maintained at trial that Barbara's son and later Barbara herself approached Poole about buying the land. Record at 45–46.

we didn't get to cost charges, on the other acres in our conversation." R. at 48. Then, when asked if they talked about price at all that day, Poole responded: "I don't think so, I think, well we probably, there is no probably about it[.]" R. at 48.

Barbara later went to the site to examine the eastern tract, thinking that she would buy the land between the road that currently separated their two properties and a creek that ran roughly parallel to that road. The two women "walked out the land" and described the borders of the proposed parcel. While they were examining the property, Poole suggested that the land fifteen feet west of the creek ought to be included in the sale. Poole explained that if the Bowlings ever needed to clean out the creek or erect a fence, the fifteen feet of land to the west of the creek would afford easier access to vehicles. After they completed their walk of the property, Poole told Barbara the price would be $15,000. R. at 13. Barbara said that she and her husband would have to contact their bank to finance the purchase. At trial, Poole testified about her recollection of the transaction: "Well, I said three acres $15,000 and then the other [half] we'd talk about it." R. at 50.

After their initial walk around the property, Poole's adult son then arrived, followed shortly thereafter by Poole's boyfriend. Poole said that she had previously surveyed a three-acre portion at the south end of the eastern tract in 1994 or 1995, believing that her son might put a mobile home on it. Poole said that they would need a new survey for the entire eastern tract and that the same survey company could survey the eastern tract because its surveyor knew the land. All four walked the south boundary line to make sure that Poole would still have access to the western tract she was retaining and that the Bowlings would have access to the eastern tract they were purchasing. According to Barbara, everyone agreed that Poole would still have access to the western tract if the west boundary line of the eastern tract was placed fifteen feet to the western edge of the creek.

Afterwards, the Bowlings called the Ripley County Bank to obtain a $15,000 loan to purchase the eastern tract. Frank Samples, the senior loan officer, told the Bowlings that they would need a written purchase agreement. Samples sent Barbara the bank's generic one-page purchase-agreement form for Barbara and Poole to use. But Barbara was unsure how to fill out the form because there was no separate deed or survey available describing the eastern tract. When she called Samples for assistance, he told her to fill out the description by describing the north, south, east, and west boundary lines as they would appear to someone standing on the eastern tract. Bowling related that Poole and her son had said that a three-acre portion of the tract had been previously surveyed and contained about three acres. Samples told Barbara to include in the description that the property was "three acres, more or less." R. at 17.

Barbara filled in the blank spaces on the form. She described in her handwriting the land that Poole was selling to the Bowlings:

> 3 Ac, more or less[,] East bound[a]ry being Farmers Retreat Road[,] South bound[a]ry being 375 South[,] North bound[a]ry being north bound[a]ry of Joyce Poole farm[,] West bound[a]ry being 15 feet west of sm. creek between Joyce Poole Home and Farmers Retreat Road to run from 375 South to north bound[a]ry of Joyce Poole Farm.

Appellant's App. at 8. The blank for the purchase price was filled in as $15,000, while the earnest money blank was marked as $50.00. Closing was set for

ninety days. The agreement was dated July 21, 1998.

Barbara and Poole reviewed the agreement in Poole's living room on July 21, 1998. According to Barbara, Poole read the agreement, including the description, and told her that it was "just fine." R. at 20. After Barbara gave Poole the $50 earnest money, Poole signed the agreement. But at trial, when asked on direct examination whether she had read the agreement, Poole responded, "Not very well." R. at 52. Then, when first asked whether she had read the legal description, she answered, "Not very well." R. at 52. Poole later testified that she had not read the description "at all" before signing the agreement. R. at 53.

Barbara brought the purchase agreement to the bank, and Samples approved the loan. Samples told Barbara that the loan would close after the survey was completed. Poole asked Barbara to call the surveying company. When Barbara called the surveying company, the company told her Poole would have to sign a request form. The company sent the form to Barbara who, in turn, brought the form to Poole. Poole read and signed the form, and Barbara returned it to the company.

According to Barbara, the surveyor met with Barbara and Poole at Poole's home. Poole told the surveyor to survey the west boundary line of the tract at fifteen feet west of the creek. The surveyor, however, placed the survey markers fifteen feet west of the center of the creek, not fifteen feet west of the western edge of the creek. Poole later noticed that the surveyor had placed the markers from the center of the creek. She called the surveyor, requesting that a new survey be done with the markers placed fifteen feet west of the western edge of the creek.[3]

The surveyor subsequently resurveyed the tract. Poole, who was caring for an ill relative at the time, asked Barbara to pick up the completed survey. The survey required Poole's notarized signature, so on September 8, 1998, Barbara and Poole met at the Ripley County Bank to have the survey signed and notarized. Poole reviewed the survey at the bank and signed it before a notary. The actual acreage of the property was nearly six acres. Barbara then recorded the survey at Poole's request.

A week or so later, Samples called Poole to set a time to close the transaction. Poole told Samples that she was not going to sell the property and would not close. She later sent the Bowlings a letter, telling them that she would not sell the property, and returned the $50 earnest money to them.

The Bowlings subsequently filed a cause of action against Poole, seeking specific performance, and recorded a *lis pendens* notice against the eastern tract. While litigation was pending, Poole sold the western tract, including her home, in two separate transactions to other buyers. The eastern tract has not been sold and re-

3. In her statement of facts on appeal, Poole asserts that Barbara paid for the survey and cites to page 33 of the trial transcript for support. Appellee's brief at 2. However, as the Bowlings point out, page 33 of the transcript does not support such an assertion. Appellant's reply brief at 4. The transcript indicates only that the survey form itself made no mention that Poole was required to pay for the survey. R. at 33. Furthermore, the Bowlings have included in the appendix to their reply brief a purported copy of the survey company's letterhead containing a handwritten note that Poole paid the survey company $760.00 for the survey. Appellant's reply brief at 10. However, "[f]actual material which was not part of the record in the trial court cannot be made part of a case on appeal merely by including it in an appendix to a party's brief." *Chesterfield Mgmt., Inc. v. Cook,* 655 N.E.2d 98, 101 (Ind.Ct.App.1995), *trans. denied.*

mains intact. After a bench trial, the trial court made findings of fact and conclusions, entering judgment in favor of Poole.

In relevant part, the findings provided:
1. The description of the real estate contained in the offer and acceptance dated July 21, 1998, signed by the parties called for the sale of three acres more or less to the Plaintiff.
2. The Boundary description of the real estate in the offer and acceptance circumscribed 5.987 acres being nearly double the acres the Defendant believed she was selling.
3. Defendant refused to continue with the sale when she realized the error.

. . .

6. That both Plaintiff and the Defendant were mistaken as to the amount of real estate to be sold.
7. That the parties were not in agreement at the time the contract was made.
8. That the mutual mistake by both parties resulted in a failure of the meeting of the minds.

Appellant's App. at 4. The Bowlings now appeal.

## DISCUSSION AND DECISION

### I. Standard of Review

■■■ When, as here, a trial court enters specific findings of fact and conclusions on its own motion, we will not set aside such "findings or judgment unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Ind.Trial Rule 52(A). The findings are clearly erroneous only when a review of the record leaves us firmly convinced a mistake has been made. *Carnahan v. Moriah Property Owners Ass'n,* 716 N.E.2d 437, 443 (Ind.1999). We disturb the judgment only when there is no evidence supporting the findings or the findings fail to support the judgment. *Yoon v. Yoon,* 711

N.E.2d 1265, 1268 (Ind.1999). We do not reweigh the evidence; rather, we consider the evidence most favorable to the judgment with all reasonable inferences drawn in favor of the judgment. *Id.* A judgment is clearly erroneous if it relies on an incorrect legal standard. *Shell Oil Co. v. Meyer,* 705 N.E.2d 962, 972 (Ind.1998).

■■■ With respect to contract disputes, we note that the primary purpose in construing a document is to ascertain and give effect to the parties' mutual intent. *Hutchinson, Shockey, Erley & Co. v. Evansville–Vanderburgh County Bldg. Auth.,* 644 N.E.2d 1228, 1231 (Ind.1994). When a court is asked to interpret an agreement, it is necessary for the court to examine the parties' intent when they drafted the document. *Kelly v. Smith,* 611 N.E.2d 118, 121 (Ind.1993). The intention of the parties to a written contract must be derived from their written expressions within the four corners of the contract. *Gyr v. Hagemann,* 130 Ind.App. 212, 221, 163 N.E.2d 620, 624 (1960). Contracts for the sale of land must be specifically enforced as written without any additions or deletions by the court. *See id.*

### II. The Bowlings' Claims

The Bowlings argue that the trial court erroneously determined that the agreement regarding the sale of the property was the result of a mutual mistake of fact. They also assert that the description of the property was unambiguous and the boundaries of the land to be sold were clearly established. Therefore, the Bowlings contend that they are entitled to specific performance because it is apparent that Poole simply changed her mind about selling property.

■■■ In accordance with the doctrine of mutual mistake, "[w]here both parties share a common assumption about a vital fact upon which they based their bargain,

and that assumption is false, the transaction may be avoided *if because of the mistake a quite different exchange of values occurs from the exchange of values contemplated by the parties.*" *Wilkin v. 1st Source Bank,* 548 N.E.2d 170, 172 (Ind.Ct. App.1990) (emphasis supplied). "It is not enough that both parties are mistaken about any fact; rather, the mistaken fact complained of must be one that is 'of the essence of the agreement, the *sine qua non,* or, as is sometimes said, the efficient cause of the agreement, and must be such that it animates and controls the conduct of the parties.'" *Jackson v. Blanchard,* 601 N.E.2d 411, 416 (Ind.Ct.App.1992) (quoting 17A Am.Jur.2d *Contracts* § 213 (1991)).

■ Here, we note that the eastern tract was specifically described in the July 21, 1998 written agreement. The evidence presented at trial demonstrated that the use of three acres in the description only arose because Poole told Mrs. Bowling that a three-acre survey had been completed on part of the eastern tract four or five years earlier. No one knew the precise acreage, because the survey was yet to be ordered and completed when the parties signed the agreement on July 21, 1998. The full description called for the sale of the eastern tract of Mrs. Poole's farm as defined by the four boundary lines. Mrs. Poole gave no indication that the amount of land to be surveyed was anything other than the entire eastern tract as described in the written agreement she signed. Moreover, the lump sum price of $15,000 to be paid for the entire eastern tract was included in the agreement. Under these circumstances, it is apparent that the acreage was never the essence of the parties' agreement. There was no evidence that either Poole or the Bowlings were mistaken about the actual tract of land to be sold. Poole had previously "walked" the property and a three-acre portion of the eastern tract had been surveyed in 1994 or 1995.

Thus, it is apparent that Poole should have known that the entire eastern tract was larger than the three acres reflected in the earlier survey. The evidence does not support a conclusion that there was a mutual mistake. Rather, the land was precisely described and the price was firmly established. In sum, it is apparent that the evidence, at best, points to a unilateral claim of mistake on Poole's part.

■ In addition to the above, we note that with respect to land descriptions, this court has held that "the order of preference for the location of boundaries" is in descending order as follows: "natural objects or land marks, artificial monuments, adjacent boundaries, courses and distances, and lastly quantity." *Hollars v. Stephenson,* 121 Ind.App. 410, 419, 99 N.E.2d 258, 262 (1951). The *Hollars* court emphasized, "On the question of acreage, the courts have held that 'the quantity of land contained in a tract is the least important element in determining the boundary.'" *Id.* (quoting *Gary Land Co. v. Griesel,* 179 Ind. 204, 100 N.E. 673, 675 (1913)).

■ As our supreme court recognized long ago, an "in gross" sale of land involves the sale of a specific tract of land for a stipulated price for the whole tract. *King v. Brown,* 54 Ind. 368, 373, 1876 WL 6844 (Ind.1876) (describing the transaction as "a contract for the sale of a specific tract, not by the acre but in gross, at a stipulated price for the whole farm" owned and occupied by the seller). In *King,* our supreme court specifically enforced a contract for the sale of a farm where the contract described the farm as "four hundred and fifty-one acres, more or less." *Id.* at 374. During negotiations over the land sale, the sellers informed the buyers that the farm had not been surveyed but that they believed the acreage was 451. After the contract was drafted, a survey

later showed that the farm was actually 410 acres. Our supreme court held that the number of acres was not "of the essence of the contract," reasoning that when " 'the words "more or less" are added, if there be a small portion more than the quantity, the vendor can not recover it; and if there be a small quantity less, the purchaser can not obtain any compensation in respect of the deficiency; *and even a large excess or deficiency has not been considered a ground for relieving a vendor or purchaser.*'" *Id.* at 375 (emphasis added) (quoting Sugden on Vendors); *see Langsdale v. Girton,* 51 Ind. 99, 102, 1875 WL 5869 (1875).

 Here, it is apparent that the contract called for an "in gross" sale of land as opposed to a "per acre" sale of land. Thus, the description of "3 Ac more or less" had to be considered in context with the remainder of the agreement. A basic rule of contract construction provides that when a contract contains general and specific provisions relating to the same subject, the specific provision controls. *Askren Hub States Pest Control Servs., Inc. v. Zurich Ins. Co.,* 721 N.E.2d 270, 280 n. 2 (Ind.Ct.App.1999). Here, the four sides of the eastern tract were specifically described. Moreover, as discussed above, it is apparent that the number of acres specified in the written agreement was not the essence of the contract. Therefore, the trial court erred in entering judgment for Poole.

### CONCLUSION

In light of our discussion above, we conclude that the trial court erred in concluding that a mutual mistake occurred between the Bowlings and Poole with regard to the sale of the real property. Moreover, the eastern tract was specifically described in the written agreement, and we cannot say that the contract provided for a "per acre" sale of the land. Thus, the trial

court erred in entering judgment for Poole.

The judgment is reversed and this cause is remanded to the trial court with instructions that it enter a final decree for the Bowlings with respect to their action for specific performance, and for all other proceedings consistent with this opinion.

NAJAM, J., and KIRSCH, J., concur.