**Clyde PERFECT and Ella Mae Perfect, Appellants– Defendants,**

v.

**Michael McANDREW, Appellee– Plaintiff.**

No. 15A05–0303–CV–139.

Court of Appeals of Indiana.

Nov. 12, 2003.

Leanna Weissmann, Lawrenceburg, IN, Attorney for Appellants.

Richard A. Butler, Lawrenceburg, IN, Attorney for Appellee.

## OPINION

SHARPNACK, Judge.

Clyde and Ella Mae Perfect (the "Perfects") appeal the trial court's judgment granting specific performance of a contract to sell real estate to Michael E. McAndrew. The Perfects raise four issues, which we consolidate and restate as:

I.  Whether the trial court's finding that the parties intended an "in gross" sale of real estate is clearly erroneous;

II.  Whether the trial court's finding that there was no mutual mistake of fact is clearly erroneous; and

III.  Whether the trial court's judgment improperly added a provision to the contract.

We affirm.

The relevant facts follow. In the spring of 1999, McAndrew became interested in purchasing real estate in Dearborn County, Indiana from the Perfects.[1] Based upon acreage listed in the deed conveying the property to the Perfects, the Perfects thought that the property consisted of 81.1 acres. On April 20, 1999, McAndrew offered to purchase the real estate from the Perfects for $250,000.00. The offer described the property as "Anderson Rd, 81.1 acres owned by Perfects." Plaintiff's Exhibit 4 at 1. On April 21, 1999, the Perfects countered with a purchase price of $252,500.00. On April 23, 1999, McAndrew, his wife, and Ashley Howe and Betsy Bates, real estate agents with StarOne Realtors, met with Clyde Perfect to view the property and its boundaries. Clyde could not walk the property because of an

---

1.  The property is actually owned only by Ella Mae Perfect. However, Ella Mae gave Clyde authority to handle the transaction for her. For purposes of this opinion, we will refer to the Perfects as the owners of the property.

injury to his knee. However, he rode his tractor along much of the boundary while the others walked. When they encountered an area that Clyde could not traverse with his tractor, Clyde described the remaining boundaries to the McAndrews and the real estate agents. The McAndrews and the real estate agents then walked the remaining boundaries. McAndrew never had any conversations with the Perfects regarding the acreage of the property. After inspecting the property, McAndrew accepted the Perfects' counteroffer of $252,500.00.

The contract provided, in part, that:

[McAndrew] shall apply for financing within 10 calendar days after acceptance of this Contract and will make a diligent effort to obtain financing. If [McAndrew] or [McAndrew's] lender does not notify Listing REALTOR or [the Perfects], in writing, that a loan commitment has been obtained, denied or waived by May 20, 1999, then [the Perfects] may, by written notice to selling REALTOR or [McAndrew], terminate this Contract.

*Id.* The contract also provided for the following contingencies:

1. Satisfactory septic approval (to [McAndrew]).

2. Satisfactory to [McAndrew] survey to be [paid] by [McAndrew] and [the Perfects] equally.

3. Satisfactory to [McAndrew] verification of easements on property.

4. [The Perfects] to remove all debris—junk around barn area and along property line as discussed.

5. Satisfactory to [McAndrew] verification of lot lines A.S.A.P.

*Id.* at 2.

On May 11, 1999, McAndrew advised Bates that he had secured a loan. McAndrew received a written loan commitment on May 21, 1999, and signed the commitment on May 25, 1999. On approximately June 20, 1999, the Perfects removed the junk and debris from the property. The survey was completed on June 24, 1999, and indicated that the property contained 96.2815 acres rather than 81.1 acres. After receiving the survey, Clyde "was quite surprised and thought about it for a while and decided [he] didn't want to give away 15 acres." Transcript at 83.

On July 8, 1999, the Perfects attempted to renegotiate the contract with three different proposals: (1) McAndrew would purchase the 96.2815 acres for an additional $35,000.00; (2) McAndrew would purchase 81 acres for $230,000.00 and the Perfects would keep 15.30 acres with west frontage on Anderson Road; or (3) McAndrew would purchase sixty acres on the east side of the property for $200,000.00. McAndrew rejected the new proposals and sought to close on the property pursuant to the contract. On August 4, 1999, the Perfects sent a letter to Howe attempting to terminate the contract because McAndrew had failed to provide a timely written notice of a loan commitment. Prior to this letter, the Perfects had not advised McAndrew or Howe of any problems regarding the timeliness of McAndrew's loan commitment. The Perfects then refused to convey the property to McAndrew.

McAndrew filed a complaint against the Perfects for specific performance. McAndrew also filed a motion for findings of fact and conclusions thereon pursuant to Ind. Trial Rule 52. After a bench trial, the trial court entered the following judgment:

1. On April 23, 1999, the parties entered into a contract for [McAndrew] to buy and the [Perfects] to sell certain real estate located in Dearborn County, Indiana. The real estate was described simply as "Anderson Rd. 81.1 acres owned by

Perfects." The [Perfects] are husband and wife, but the land in question is presently titled only in the name of Ella Mae Perfect.

2. On April 23, 1999, the parties met at the real estate and [McAndrew] and [Clyde Perfect] discussed the boundaries of the property. The parties agreed upon what land was being bought and sold.

3. A survey was required by the terms of the contract to purchase the real estate, to be paid equally by the parties. That survey was completed by registered land surveyor Roger W. Woodfill by survey dated June 24, 1999. A copy of the real estate description prepared by the surveyor is attached to this Judgment and Order as Exhibit A. That survey shows the land contains 96.2815 acres.

4. The [Perfects] were surprised when they received the survey and discovered the land contained more acreage than they thought. At that point, for the first time, they had second thoughts about the sale.

5. On the issue of what land was intended to be bought and sold there was a meeting of the minds. There was no ambiguity, no fraud, no misrepresentation, and no equitable circumstances that would indicate otherwise. This was an in gross sale of the land owned by the Defendant Ella Mae Perfect. It had been described in the deed both [the Perfects] received as containing 83.08 acres. Two one acre tracts were subsequently sold off that tract. The tract was described in a plat book as containing 81 acres. But, the [Perfects] definitely intended to sell and [McAndrew] intended to buy the entire tract. Only when the survey demonstrated more acreage did the [Perfects'] position change. In such an event the sale of the specific tract will prevail over acreage. *See Bowling v. Poole*, (Ind.App. 2001) 756 N.E.2d 983. *See also King v. Brown*, (Ind.1876) 54 Ind. 368, and *Langsdale et al. v. Girton Ex'r*, 51 Ind. 99, 1875 WL 5869 (1875). *See also Cravens v. Kiser*, (Ind.1853) 4 Ind. 512 for a statement of the general rule. *See also Lehman v. Pierce*, 109 Ind.App. 497, 36 N.E.2d 952 (1941), where the legal maxim "That which may be made certain is certain" is applied to allow explanatory evidence to identify real estate. There was never a question by either party of what real estate was being sold. The difficulty came when the sellers realized for the first time that the assumed acreage was wrong. At that point the [Perfects] attempted to renegotiate the terms of the contract.

6. Another provision of the Contract to Purchase was that the [Perfects] would remove certain debris and junk around the barn area and property line. This was done some time on or about June 20, 1999.

7. Soil testing had to be completed for septic approval. This was also not done until some time in June 1999.

8. [McAndrew] had a mortgage loan commitment dated May 21 and May 25, 1999 between [McAndrew] and United Community Bank. [McAndrew] told Betsy Bales of Star One of the loan commitment. By written agreement, Star One was a duel (sic) real estate agent for the transaction. Star One received a copy of the loan commit-

ment shortly after it was obtained. This notice was adequate notice to the [Perfects] of the loan commitment having been received by the [Perfects].

9. The real estate contract stated that a loan commitment was to be secured by May 20, 1999. Although this was not done until May 25, [1999] there is no evidence that this was a material breach. The parties continued to move toward a closing until the survey was received. No delay in the sale could have been occasioned by this five day delay.

10. By a letter dated August 4, 1999 from the [Perfects] to Ashley Howe, a real estate agent for Star One Realtors, the [Perfects] stated:

"Please accept this letter as written notice pursuant to the Contract of Purchase prepared by you, dated April 20, 1999, in which real estate owned by us in Dearborn County, Indiana, was to be sold. This is written notice of termination of the contract, pursuant to paragraph six wherein, buyer was to provide, in writing on or before May 20, 1999 evidence of a loan commitment. Buyer has failed to provide that written notice and pursuant to the contract, it is our election to terminate the contract pursuant to that clause.

Please accept this notice of termination as your authorization to return any earnest money that has been paid by buyer to you."

The August 4, 1999 date was the first time [McAndrew] was aware of the [Perfects'] claim they would attempt to terminate the sale for this reason.

11. [McAndrew] proceeded with making financial arrangements and had a loan closing and sale set up through the real estate agent for September 11 and September 16, 1999.

12. [McAndrew] at all times stands ready to close the real estate transaction, and is seeking specific performance.

13. The fact that the loan commitment was not received by the [Perfects'] agent until a week after the time set in the Contract to Purchase is not a material breach of the contract. Items such as the completion of the survey, removal of junk, and the soil testing for septic approval had yet to be done, so the failure in no way hampered the completion of the transaction.

14. The law is with [McAndrew].

IT IS THEREFORE CONSIDERED, ORDERED, AND ADJUDGED BY THE COURT that [McAndrew] is entitled to specific performance of the Contract to Purchase entered into between the parties on April 23, 2003. Upon tendering the sum of Two Hundred Fifty–Two Thousand Five Hundred Dollars ($ 252,500.00) to the [Perfects] he shall be entitled to a warranty deed to the real estate described in the attached Exhibit A.

Appellant's Appendix at 6–10.

■ The Perfects appeal the trial court's judgment in favor of McAndrew. Because the trial court entered findings of fact and conclusions of law at McAndrew's request, we review the trial court's order pursuant to Ind. Trial Rule 52, which provides that "the court on appeal shall not set aside the findings of judgment unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." *See also Cannon v. Cannon,* 758 N.E.2d 524, 526 (Ind.2001). "Findings are clearly

erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen,* 671 N.E.2d 98, 102 (Ind.1996). A judgment is clearly erroneous only if its findings of fact do not support its conclusions thereon, or its conclusions thereon do not support its judgment. *Id.* In our review, we first consider whether the evidence supports the factual findings. *Menard, Inc. v. Dage–MTI, Inc.,* 726 N.E.2d 1206, 1210 (Ind.2000), *reh'g denied.* Second, we consider whether the findings support the judgment. *Id.*

## I.

The first issue is whether the trial court's finding that the parties intended an "in gross" sale of real estate is clearly erroneous. The Perfects argue that the trial court erred when it determined that the parties intended an in gross sale of the property because: (1) the property was discussed in terms of 81.1 acres, not 81.1 acres "more or less;" (2) all of the parties were surprised to discover that the property was actually 96.2815 acres and surprise is not an element contemplated by in gross sales; and (3) the parties' actions demonstrated that acreage was important to the bargain. McAndrew argues that nothing indicated that the sale of the land was based upon a price per acre and the phrase "more or less" in describing the acreage is not determinative of whether the sale is an in gross sale or a price per acre sale. Further, McAndrew argues that the parties' actions demonstrated that the acreage of the property was not important to the bargain.

In general, where property is "sold in lump, and for a gross sum," such that "it appears by words of qualification, as 'more or less,' that the statement of the quantity of acres in the deed is mere matter of description and not of the essence of the contract, the buyer takes the risk of the quantity" so long as there is no fraud, concealment, or misrepresentation. *Tyler v. Anderson,* 106 Ind. 185, 189, 6 N.E. 600, 601 (Ind.1886); *see also Cravens v. Kiser,* 4 Ind. 512, 513 (1853) ("[W]here land is sold by metes and bounds, and estimated to contain a specific quantity, or for 'more or less,' and a gross sum is paid for the entire tract, the vendee will not be entitled to an abatement in price should the number of acres fall short of the estimated quantity," unless there is fraud or concealment on the part of the vendor.). However, where property is "sold at so much per acre, and there is a deficiency in the number [of acres] conveyed, the purchaser will be entitled to a compensation." *Hays v. Hays,* 126 Ind. 92, 94, 25 N.E. 600, 601 (1890) (holding that the purchaser was entitled to compensation where the property was sold at $100 per acre and estimated to contain 28 40/100 acres but actually contained only 23 40/100 acres).

Both parties argue that our decision in *Bowling v. Poole,* 756 N.E.2d 983 (Ind.Ct. App.2001), is instructive in determining whether this was an in gross sale or a price per acre sale. In *Bowling,* the Bowlings and Poole had adjoining farms. *Id.* at 985. Poole offered to sell the Bowlings a portion of her property adjoining the Bowlings' farm for $15,000.00. *Id.* Barbara Bowling and Poole met and walked the property. *Id.* at 986. Poole agreed to sell and Barbara agreed to buy the land between the road that separated their two properties and a creek that ran roughly parallel to that road plus the land fifteen feet west of the creek. *Id.* Poole thought that the tract contained approximately three acres. *Id.* Barbara drafted a contract describing the land as three acres, more or less and describing the proposed boundaries. *Id.* Poole signed the contract. *Id.* at 987. As part of the Bowlings' loan,

the bank required a survey of the property. *Id.* The survey revealed that the tract contained nearly six acres. *Id.* Poole then refused to sell the property. *Id.* The Bowlings filed a complaint for specific performance. *Id.* The trial court found that the parties "were mistaken as to the amount of real estate to be sold" and, thus, "were not in agreement at the time the contract was made." *Id.* at 988. Consequently, the trial court found that "the mutual mistake by both parties resulted in a failure of the meeting of the minds." *Id.*

On appeal, we noted that "the order of preference for the location of boundaries" is in descending order as follows: "natural objects or land marks, artificial monuments, adjacent boundaries, courses and distances, and lastly quantity." *Id.* at 989 (quoting *Hollars v. Stephenson,* 121 Ind. App. 410, 419, 99 N.E.2d 258, 262 (1951)). Thus, "[o]n the question of acreage, the courts have held that 'the quantity of land contained in a tract is the least important element in determining the boundary.'" *Bowling,* 756 N.E.2d at 989 (quoting *Hollars,* 121 Ind.App. at 419, 99 N.E.2d at 262). Further, we recognized that "an 'in gross' sale of land involves the sale of a specific tract of land for a stipulated price for the whole tract." *Id.* (citing *King v. Brown,* 54 Ind. 368, 373 (1876)).

We held that it was apparent that the contract between the Bowlings and Poole called for an in gross sale of land as opposed to a per acre sale of land. *Id.* The four sides of the tract were specifically described, and it was apparent that the number of acres specified in the written agreement was not the essence of the contract. *Id.* Therefore, we held that the trial court erred by entering judgment for Poole. *Id.*

The Perfects argue that the sale in *Bowling* was an in gross sale because the phrase "more or less" was included on the contract. Thus, according to the Perfects, because the contract here did not contain the phrase "more or less," the sale here was a per acre sale. McAndrew responds that the sale was an in gross sale despite the lack of the phrase "more or less." In *Hays,* our supreme court discussed the use of the phrase "more or less" and concluded that:

> The question of quantity, in its most complicated form, usually arises in sales of land in compact bodies, sold under some specific name, or by particular description, and as containing, by estimation, a given number of acres, or a given number of acres more or less. The difficulty arises in determining whether the sale was intended to be in gross or by the acre. If in gross, the mention of the quantity of acres after another and certain description, whether by metes and bounds, or other known specifications, is not a covenant or agreement as to the quantity to be conveyed. In such cases the statement of acreage is regarded as mere matter of description, and not of contract. *But the terms "by estimation," "more or less," or other expressions of similar import, added to a statement of quantity, can only be considered as covering inconsiderable or small differences, one way or the other, and do not, in themselves, determine the character of the sale.* Even where the sale has been in gross, and not by the acre, if it appear that the estimated number of acres was in fact the controlling inducement, and that the price, though a gross sum, was based upon the supposed area, and measured by it, equity will interfere to grant relief, and rescind the contract on the ground of gross mistake.

*Hays,* 126 Ind. at 93, 25 N.E. at 600 (citation omitted) (emphasis added). Thus, while the phrase "more or less" may assist

in determining if the sale was an in gross sale or a price per acre sale, the language is not determinative.

Despite the lack of the phrase "more or less" in this case, we find *Bowling* instructive. Here, the contract described the land as "Anderson Rd, 81.1 acres owned by Perfects." Plaintiff's Exhibit 4 at 1. Before accepting the Perfects' counteroffer, McAndrew walked the property with Clyde, and Clyde pointed out the boundaries. McAndrew never had any conversations with the Perfects regarding the acreage of the property. In fact, Clyde testified that he never discussed the acreage with McAndrew and did not counteroffer with a price per acre. Thus, there is no evidence that the parties ever discussed a per acre price for the property. There is also no indication that the estimated acreage was the controlling inducement in the contract. Although the contract describes the property as "Anderson Rd, 81.1 acres owned by Perfects," the evidence indicates that the estimated acreage was merely a manner of describing the property. The evidence indicates that the parties contemplated a sale of the entire tract for a lump sum, not a price per acre. *See, e.g., Bowling*, 756 N.E.2d at 990 (holding that the parties contemplated an in gross sale of the property). Consequently, the trial court's finding that the sale was an in gross sale rather than a price per acre sale was not clearly erroneous.

## II.

The next issue is whether the trial court's finding that there was no mutual mistake of fact is clearly erroneous. The trial court found that "[o]n the issue of what land was intended to be bought and sold there was a meeting of the minds. There was no ambiguity, no fraud, no misrepresentation, and no equitable circumstances that would indicate otherwise." Appellant's Appendix at 7. The Perfects argue that the trial court's finding is clearly erroneous because this "is a classic example where mutual mistake of fact renders the contract voidable by either party." Appellant's Brief at 14. The Perfects argue that the parties thought that the property was 81.1 acres and that the parties were surprised to learn that the property actually contained 96.2185 acres. McAndrew argues that the acreage was not the "essence of the agreement," and, thus, no mutual mistake of fact exists. Appellee's Brief at 15.

The doctrine of mutual mistake provides that "[w]here both parties share a common assumption about a vital fact upon which they based their bargain, and that assumption is false, the transaction may be avoided if because of the mistake a quite different exchange of values occurs from the exchange of values contemplated by the parties." *Bowling*, 756 N.E.2d at 988–989 (quoting *Wilkin v. 1st Source Bank*, 548 N.E.2d 170, 172 (Ind.Ct.App.1990)). "It is not enough that both parties are mistaken about any fact; rather, the mistaken fact complained of must be one that is 'of the essence of the agreement, the *sine qua non*, or, as is sometimes said, the efficient cause of the agreement, and must be such that it animates and controls the conduct of the parties.'" *Bowling*, 756 N.E.2d at 989 (quoting *Jackson v. Blanchard*, 601 N.E.2d 411, 416 (Ind.Ct.App. 1992)).

We addressed the issue of a mutual mistake in the context of a similar contract in *Bowling*, 756 N.E.2d at 989. There, the parties described the property by the four boundary lines and an estimation of the acreage. *Id.* The agreement also included a lump sum price of $15,000 to be paid for the entire tract. *Id.* We held that "[u]nder these circumstances, it is apparent that the acreage was never the essence of the par-

ties' agreement." *Id.* There was no evidence that the parties were mistaken about the actual tract of land to be sold. *Id.* We concluded that the evidence did not support a conclusion that there was a mutual mistake. *Id.* Rather, it was "apparent that the evidence, at best, points to a unilateral claim of mistake on Poole's part." *Id.*

Similarly, here, there is no evidence that the parties were mistaken about the actual tract of land to be sold. In fact, Clyde testified that "[t]here wasn't any question about which piece of property [they] were dealing for. The only question [was] how many acres it really [was]." Transcript at 92. There is also no evidence that the exact acreage was the essence of the parties' agreement. As noted above, it is not enough that McAndrew and the Perfects were mistaken about the acreage. Rather, to constitute a mutual mistake of fact, the fact complained of must be one that is "of the essence of the agreement" and "must be such that it animates and controls the conduct of the parties." *Bowling,* 756 N.E.2d at 989. Based upon the evidence, we cannot say that the acreage of the property was the essence of the agreement or controlled the conduct of the parties. *See, e.g., id.* at 990 (holding that the number of acres was not the essence of the contract). Consequently, we cannot say that the trial court's finding that no mutual mistake of fact existed here is clearly erroneous.

### III.

The next issue is whether the trial court's judgment improperly added a provision to the contract. The Perfects argue that the clear contract language requires the sale of 81.1 acres but the trial court ordered the sale of 96.2185 acres, thus adding a term to the written contract. McAndrew argues that the trial court did not add a new term to the contract. Rather, according to McAndrew, the trial court correctly determined that the Perfects intended to sell and McAndrew intended to buy the entire tract.

The primary purpose in construing a document is to ascertain and give effect to the parties' mutual intent. *Bowling,* 756 N.E.2d at 988. When a court is asked to interpret an agreement, it is necessary for the court to examine the parties' intent when they drafted the document. *Id.* The intention of the parties to a written contract must be derived from their written expressions within the four corners of the contract. *Id.* Unambiguous contracts must be specifically enforced as written without any additions or deletions by the court. *Id.; see also Kaghann's Korner, Inc. v. Brown & Sons Fuel Co., Inc.,* 706 N.E.2d 556, 565 (Ind.Ct.App. 1999) ("We will neither construe clear and unambiguous provisions nor add provisions not agreed upon by the parties."), *clarified on reh'g on other grounds,* 711 N.E.2d 1286 (Ind.Ct.App.1999). However, when the language in a contract is ambiguous or uncertain, its meaning is to be determined by the consideration of extrinsic evidence. *Samar, Inc. v. Hofferth,* 726 N.E.2d 1286, 1290 (Ind.Ct.App.2000), *trans. denied.* A contract is ambiguous if reasonably intelligent people could find its provisions susceptible to more than one interpretation. *Id.*

Here, although the trial court did not specifically find the "Anderson Rd, 81.1 acres owned by Perfects" language to be ambiguous, it considered extrinsic evidence in interpreting the language. Plaintiff's Exhibit 4 at 1. The description of the property is ambiguous because it could be interpreted to mean the entire tract of land on Anderson Road owned by the Perfects or to mean only 81.1 acres of the land. Because the description is ambigu-

ous, the trial court appropriately considered extrinsic evidence regarding the transaction. The extrinsic evidence indicated that the parties intended that the Perfects sell and McAndrew purchase the entire tract, not just 81.1 acres. Further, the evidence indicated that the sale was an in gross sale and not a price per acre sale. *See supra* Part I. Consequently, the trial court did not add a term to the contract, but rather properly interpreted an ambiguous contract with the aid of extrinsic evidence.

For the foregoing reasons, we affirm the trial court's judgment in favor of McAndrew on his complaint for specific performance.

Affirmed.

BROOK, C.J., and BAKER, J., concur.