## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED
08/28/2017, 10:18 am
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Julie C. Dixon
Darlene R. Seymour
Ciyou & Dixon, P.C.
Indianapolis, Indiana

ATTORNEY FOR APPELLEE

William O. Harrington
Harrington Law, P.C.
Danville, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

D.G.,

*Appellant-Petitioner,*

v.

S.G.,

*Appellee-Respondent.*

August 28, 2017

Court of Appeals Case No.
32A01-1701-DR-164

Appeal from the Hendricks
Superior Court

The Honorable Karen M. Love,
Judge

Trial Court Cause No.
32D03-1501-DR-33

**Bailey, Judge.**

# Case Summary

[1] The marriage of D.G. ("Mother") and S.G. ("Father") was dissolved, they were awarded joint legal and physical custody of their two sons ("Children"), and their marital property was distributed in a purportedly 50/50 split. Mother now appeals, challenging the custody order and the property division. We affirm in part, reverse in part, and remand with instructions.

# Issues

[2] Mother presents three issues for review:

    I.    Whether she was denied due process when the final hearing was ended without the testimony of two anticipated witnesses, her parents;

    II.    Whether the joint physical custody/parenting time order is clearly erroneous; and

    III.    Whether the property division is clearly erroneous.

# Facts and Procedural History

[3] The parties were married in September of 1999. In September of 2014, Father moved out of the marital residence. On January 22, 2015, Mother filed a petition to dissolve the marriage. At that time, Children were aged eleven and seven. They initially remained in the primary physical custody of Mother, who is a critical care flight nurse with a rotating work schedule.

[4] At first, Father would care for Children in the marital residence while Mother worked two shifts per week (one 24-hour shift and one 12-hour shift). Father worked as a graphic designer with regular daytime hours. He was also responsible for maintenance and rent collection with respect to the parties' five rental houses. Children were involved in multiple sports, including baseball, basketball, and football, some with traveling or All-Star teams. The complicated family schedules were such that the parents welcomed frequent help from both paternal and maternal grandparents ("Grandparents"). Grandparents' assistance included such things as drop-off at school, meeting the school bus after school, providing meals, and assisting with homework.

[5] The informal arrangement soured after Mother alleged that she found web-cams that had been installed by Father in the marital residence, more specifically, in her bedroom. Mother began to rely upon her mother ("Maternal Grandmother") to stay in the marital home with Children when she worked overnight shifts, as opposed to Father doing so. Father desired more access to Children and, with the assistance of his father ("Paternal Grandfather") obtained a home in Children's school district. Father began to rely upon Paternal Grandfather to regularly meet the school bus at the marital residence and bring Children to Father when his work day ended. It was not always clear who would be awaiting Children. On at least one occasion, the younger child was left alone and once, Paternal Grandfather and Maternal Grandmother got into a disagreement over who would take Children after school.

[6] A Guardian Ad Litem ("the GAL") was appointed on May 29, 2015. As the dissolution action was pending in 2015 and 2016, the GAL made several recommendations to the court and various interim parenting time orders were entered. One preliminary agreed order incorporated the parents' agreement that, if one parent was working and the other was available, Children would be with the non-working parent. However, the parents also agreed upon a summer break exception, that is, if a parent worked during his or her extended parenting time and a grandparent was available, the other parent need not be given the right-of-first-refusal of parenting time. Over the course of the interim orders, Father's parenting time progressed to Guideline-based parenting time plus one overnight during the week. At some point, Mother changed her 12-hour shift to a daytime shift.

[7] The parties reached a partial mediated agreement with respect to some of their property. They agreed that Father would continue to manage the rental properties and collect rents. He would report any gains or losses on his individual income tax return for 2015. They had the rental properties and marital residence appraised, and stipulated to the appraisal values. They also agreed upon the valuation of vehicles and items of personal property. Mother was to retain the marital residence and each party was to retain the vehicle in his or her possession.

[8] The final hearing commenced on September 29, 2015, and continued on January 14 and July 14, 2016. By this juncture, the contested issues involved

custody, parenting time, and whether a deviation from the presumptive 50/50 split of marital property was warranted.

[9] Mother's position was that she should have primary physical custody of Children, and Father should have Children during her work hours and alternate weekends. She requested a 60/40 split of marital assets in her favor, citing significant monetary and sweat-equity contributions by her parents pertinent to the real estate property acquisitions. Mother asked to be awarded two of the rental properties as well as the marital residence.

[10] Father's position was that he should have custody of Children half-time and be awarded half the marital estate. He requested all five of the rental properties. He testified that Mother's preference for allowing Maternal Grandmother to provide childcare had caused difficulty with him having the time to which he was entitled. The GAL recommended a 60/40 split of parenting time, with Mother having 60% and Father having "parenting guidelines plus one [overnight]." (Tr. Vol. II pg. 212.) She also recommended that, when grandparents were available during an extended school break, the parent exercising parenting time had no obligation to offer the other parent a right-of-first-refusal for work hours.

[11] Children's therapist also testified, acknowledging the bond between Children and both parents, as well as between Children and Grandparents. She related the eldest child's expressed desires for a set schedule and ability to see both parents regularly. She opined that both parents were meeting Children's

emotional needs, but further opined that Children were over-extended by sports activities and needed a more balanced schedule.

[12] As the second day of testimony ended, the trial court addressed the attorneys and described the anticipated order on parenting time, which appeared to mirror the GAL's recommended 40/60 split. Father was to have alternate weekends consisting of Friday, Saturday, and Sunday. Father was to have a Wednesday overnight when Mother's work schedule did not include a weekday. Thus, he was to be assured of having at least five of fourteen nights. The right-of-first-refusal of parenting time provision was to apply to time blocks of four hours or more and "ancillary provisions of the [Indiana Parenting Time] Guidelines" (hereinafter, "Guidelines") were to apply. (Tr. Vol. IV, pg. 84.) The parties were to use the services of a parenting time coordinator for two years. The trial court also distributed some of the personal property before adjourning.

[13] Immediately before the final hearing concluded on the third day, Mother testified that her 12-hour work shift had changed. She was working from 6:00 to 6:00 p.m. in Indianapolis and would expect to arrive home around 6:30 p.m. Her 24-hour shift remained a rotating shift.

[14] On December 27, 2016, the trial court issued a decree dissolving the parties' marriage. The final order on custody and parenting time did not reflect the trial court's oral pronouncement; rather, the order allocated set parenting days on a 50/50 basis with additional time to Father when Mother worked. The marital

estate was to be divided without Mother's requested deviation from a 50/50 split. Father was awarded all the rental properties. Mother retained the marital residence and was ordered to pay Father $7,278.34 as an equalization payment. This appeal ensued.

# Discussion and Decision

## Due Process

[15] Mother argues that the trial court denied her a sufficient opportunity to present witnesses, thereby violating her due process rights. The Fourteenth Amendment prohibits a state from depriving a person of "life, liberty, or property, without due process of the law." U.S. Const. amend. XIV, § 1. In general, due process requires notice, an opportunity to be heard, and an opportunity to confront witnesses. *Morton v. Ivacic*, 898 N.E.2d 1196, 1199 (Ind. 2008). Whether a party was afforded an opportunity to be heard is a question of law, which is reviewed de novo. *Id.*

[16] Mother contends that, throughout the final hearing, she "made it clear" that she intended to call her parents as witnesses, but was ultimately prevented from doing so by the court's abrupt termination of the proceedings at noon on the third day of testimony. Appellant's Brief at 30. The record does not support Mother's claim of an abrupt and unexpected end to the proceedings.

[17] Presumably, Mother wished to have her parents describe their contributions to the acquisition of the marital estate. Mother testified in some detail about her

parents' financial help and her father's renovation work. A brief discussion ensued between the trial court and Mother's counsel as to whether additional testimony in this area would be redundant and time-consuming, with the trial court ultimately saying, "I'll let you decide how to use your time." (Tr. Vol. III, pg. 79.) As the second day of testimony neared an end, the trial court asked Mother's counsel for an estimate of how much time should be allotted for the final day of hearing. Counsel requested a "half-day" and the trial court asked if three hours would be enough, to which counsel responded, "I would hope so." (Tr. Vol. IV, pg. 83.) Three hours were allotted, without objection.

[18]     On the final day of the hearing, Father objected that Mother was "rehashing" previous testimony and, in deciding to allow the line of inquiry by Mother's counsel to proceed, the trial court cautioned, "if we run out of time, we're out, we're done today at noon." (Tr. Vol. IV. pg 101. Mother's counsel responded, "Yes, your honor, I understand." (Tr. Vol. IV. pg 101.) Thereafter, the trial court reminded counsel on multiple occasions that time was drawing short. By the noon deadline, Mother's counsel had not called either of Mother's parents to testify. Nor did counsel make an offer of proof as to what their anticipated testimony would be.

[19]     Under the invited error doctrine, a party may not take advantage of an error that she commits, invites, or which is the natural consequence of his own neglect or misconduct. *Trabucco v. Trabucco*, 944 N.E.2d 544, 551 (Ind. Ct. App. 2011), *trans. denied*. Here, the trial court repeatedly engaged Mother's counsel in discussions of timing issues. Counsel acquiesced to a three-hour

hearing on the final day and chose to elicit other testimony in lieu of calling Mother's parents to testify. Mother may not now complain that she was deprived of the opportunity to present her case, particularly when she has not identified any additional factual detail that would have been forthcoming from one of her parents.

## Custody and Parenting Time Order

[20] The trial court ordered that Mother and Father share joint legal and physical custody of Children, with Mother having overnights Monday, Tuesday, and alternate weekends beginning Friday. Father was to have overnights Wednesday, Thursday, and alternate weekends beginning Friday. Father was given additional parenting time based upon Mother's work schedule. Ancillary provisions of the Guidelines were to apply, except that the right-of-first refusal would not apply during summer break, to permit greater grandparent interaction with Children.

[21] Mother argues that the award of joint physical custody to Father is unsupported by the evidence. She asserts that Father now has more parenting time than the half-time he requested and the 40/60 split recommended by the GAL, which the trial court had appeared inclined to adopt in its oral pronouncement.

[22] Father filed a written request for special findings pursuant to Indiana Trial Rule 52(A). When a trial court enters findings of fact pursuant to this rule, we review for clear error, employing a two-tiered standard of review. *In re the Paternity of M.G.S.*, 756 N.E.2d 990, 996 (Ind. Ct. App. 2001). First, we must

determine whether the evidence supports the trial court's findings of fact and second, we must determine whether those findings of fact support the trial court's conclusions thereon. *Id.* Findings are clearly erroneous only when the record leaves us with a firm conviction that a mistake has been made. *Bowling v. Poole*, 756 N.E.2d 983, 988 (Ind. Ct. App. 2001). We do not reweigh the evidence, but consider the evidence most favorable to the judgment with all reasonable inferences drawn in favor of the judgment. *Id.* A judgment is clearly erroneous if it relies on an incorrect legal standard. *Id.*

[23] In conjunction with the Trial Rule 52 standard, there is a longstanding policy that appellate courts should defer to the determination of trial courts in family law matters. *Gold v. Weather*, 14 N.E.3d 836, 841 (Ind. Ct. App. 2014). We accord this deference because the trial court, who saw and interacted with the witnesses, is in the best position to assess credibility and character. *Id.*

[24] The court is to make a custody determination in accordance with the best interests of the child or children, and is required to consider all relevant factors, including:

> (1) The age and sex of the child.
>
> (2) The wishes of the child's parent or parents.
>
> (3) The wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age.
>
> (4) The interaction and interrelationship of the child with:

(A) the child's parent or parents;

(B) the child's sibling; and

(C) any other person who may significantly affect the child's best interests.

(5) The child's adjustment to the child's:

(A) home;

(B) school; and

(C) community.

(6) The mental and physical health of all individuals involved.

(7) Evidence of a pattern of domestic or family violence by either parent.

(8) Evidence that a child has been cared for by a de facto custodian[.]

Ind. Code § 31-17-2-8.

[25] Here, the decree is arranged such that there are 157 uncaptioned paragraphs preceding a comparatively brief section captioned Conclusions of Law. These uncaptioned paragraphs intertwine dispositional language, such as "each parent shall be entitled to call the children," with findings of fact. (Tr. Vol. I, pg. 14.)

We have attempted to glean the trial court's factual findings from the order, relative to the statutory factors.

[26] The trial court found the following: both parents love and prioritize Children; Father has regular work hours and flexibility; Paternal Grandfather is involved in school pick-up and homework; Mother has a rotating work schedule lacking predictability;[1] both parents have always been very involved with Children; Children are bonded to both parents and identified positive aspects of each; during the marriage, each parent had performed household tasks and had left work early to get a sick child; Father had coached Children's sports teams; Mother had been responsible for medical appointments; after the separation, Mother refused Father parenting time in favor of Maternal Grandmother having Children while Mother worked; Father had been flexible with requested schedule changes; the parents live in close proximity to each other; the eldest child advised his therapist that he did not like an unpredictable schedule and missed either parent if he didn't see them for two or three days;[2] he also reported enjoying hunting with Maternal Grandfather; the younger child reported that he wanted to see his parents equally; Children have friends, activities, and stability in their current school system; and both sets of grandparents have been very involved with Children in a positive manner. The

---

[1] The trial court's review of Mother's 12-hour work shifts (9 a.m. to 9 p.m., 9 p.m. to 9 a.m., 7 a.m. to 7 p.m., and 7 p.m. to 7 a.m.) did not address Mother's final testimony that she then worked her 12-hour shift in Indianapolis from 6 a.m. to 6 p.m.

[2] The trial court entered a specific finding that the therapist's testimony was found to be credible.

trial court specified that it gave substantial weight to the GAL's testimony and that Children needed substantial time with each parent.

[27] These factual findings have evidentiary support. There was ample testimony of Children's interactions with their parents and their grandparents. By all accounts, Children have tremendous family support and emotionally healthy relationships with both parents and their extended family. Both parents have demonstrable skills in meeting Children's needs and have historically prioritized Children. Children expressed desires to have regular contact with both parents. With this factual background, the order for joint physical custody has support. We are not firmly convinced that a mistake has been made.

[28] That said, the custody and parenting time order cannot completely achieve both Children's wishes and the trial court's expressed objectives – equal parenting time *and* predictability. Father and Mother earn their relatively high incomes, benefiting Children, by sometimes working non-traditional hours. Mother earns around $100,000 annually as a flight nurse, while Father has a salary of $48,000 plus income from five rental properties. Neither critical care nursing nor responding to tenant's maintenance and repair issues is confined to a "9 to 5" schedule.

[29] Mother asserts that the trial court prioritized predictability over equal parenting time and gave Father more than one-half time. According to Mother, she will inevitably lose some time due to her work schedule, the trial court mis-stated

her scheduled hours, and she was deprived of the make-up time contemplated by the Guidelines.

[30]     Although Mother appears to have some control over her schedule, and is now working her 12-hour shift as a day-time shift,[3] her 24-hour shifts are subject to rotation.  Thus, she will inevitably be unable at some times to exercise her scheduled parenting time.  However, we do not read the custody and parenting time order as excluding the make-up provision of the Guidelines.  The order expressly provides that ancillary provisions of the Guidelines apply, and the Guidelines contemplate parental make-up time for parents with irregular work schedules.  Paragraph 5 of the Commentary to Section II, Specific Parenting Time Provisions, states:

> For parents with non-traditional work schedules, who may regularly work weekends, weekday parenting time should be substituted for the weekend time designated in these rules. Similar consideration should also be given to parents with other kinds of non-traditional work hours.

We discern no express or implicit intent on the part of the trial court to exclude make-up time.  Without the Guideline-promoted make-up time for missed parenting time due to work schedule irregularity, the goal of roughly equal parenting time would not be achieved here.  We further observe that, although

---

[3] Mother testified without objection or contradiction in this regard.

make-up time may present some logistical challenges, the parents have the benefit of a parenting coordinator for a two-year period.

[31] However, we agree with Mother that the trial court's order did not reflect her latest schedule change with respect to the 12-hour shift. The trial court contemplated 12-hour shifts where Mother worked up until 9 p.m. or began work at 9 p.m. Either of these situations involved Father having Children additional time and taking them to school the next morning. With a day shift of 6 a.m. to 6 p.m., different considerations are present. We remand to the trial court with instructions to enter a parenting time order incorporating the most current parental work schedule.

[32] Finally, Mother contends that the summer break order allowing grandparents to have priority is contrary to the Guideline provisions and her "fundamental right as a parent to raise her children." Appellant's Brief at 21. Although the factual findings with respect to the significant grandchild-grandparent bonds have evidentiary support, the findings do not support the conclusion that parents should be deprived of their right-of-first refusal of parenting time during summer or extended school breaks. The trial court made no factual finding that either parent is unable or unwilling to exercise additional parenting time during such breaks. Nor did the parties agree to this provision as part of the final order.[4] We agree with Mother that the provision was entered in contravention

---

[4] Parents had reached such an agreement for one prior summer during the pendency of the dissolution proceedings.

of the Guidelines, which are enacted to implement the exercise of parental rights. Our family law statutes and Guidelines do not provide grandparents with access rights superior to those of parents who desire to spend additional time with a child.

# Property Division

[33] Mother presents a two-fold challenge to the property distribution. First, she argues that a deviation from an equal split is warranted because Maternal Grandparents made significant monetary and sweat-equity contributions to the acquisition of the marital residence and the rental properties. Second, she claims that the trial court erred in its inclusion and exclusion of assets. Mother argues that rental income should be a divisible asset and the value of the Children's 529 college accounts is not a marital asset.

## Presumptive Split

[34] Indiana Code Section 31-15-7-5 provides:

> The court shall presume that an equal division of the marital property between the parties is just and reasonable. However, this presumption may be rebutted by a party who presents relevant evidence, including evidence concerning the following factors, that an equal division would not be just and reasonable:
>
> (1) The contribution of each spouse to the acquisition of the property, regardless of whether the contribution was income producing.

(2) The extent to which the property was acquired by each spouse:

    (A) before the marriage; or

    (B) through inheritance or gift.

(3) The economic circumstances of each spouse at the time the disposition of the property is to become effective, including the desirability of awarding the family residence or the right to dwell in the family residence for such periods as the court considers just to the spouse having custody of any children.

(4) The conduct of the parties during the marriage as related to the disposition or dissipation of their property.

(5) The earnings or earnings ability of the parties as related to:

    (A) a final division of property; and

    (B) a final determination of the property rights of the parties.

[35] Mother testified that, at the beginning of the marriage, her parents had purchased a house and then transferred it to Mother and Father for $36,000 less than the purchase price.[5] She also testified that her parents significantly assisted the younger couple in flipping houses and securing rental properties. For example, they provided interest-free loans and once transferred a property after

---

[5] Father moved into the home and was renovating it prior to the marriage.

repairs had been made. Maternal Grandfather and Father attended auctions together to obtain properties. Maternal Grandfather was very active in renovation; for example, he installed roofing and siding, dug a well, and carpeted floors. There was also testimony that Paternal Grandfather performed some renovation work and that Father would assist Maternal Grandfather at Maternal Grandfather's properties. Mother managed the income from the rental properties.

[36] The properties at issue were not inherited or acquired by the efforts of only one spouse. Each spouse contributed to the acquisitions, assisted by generous gifts of time and money from Maternal Grandparents. The trial court entered findings of fact acknowledging contributions by Mother's parents and the parties' respective financial positions as of the final hearing. Ultimately, the trial court determined that a deviation from the presumptive 50/50 split was unwarranted. A disposition is to be considered as a whole, not item by item, and "[e]ven if some items meet the statutory criteria that may support an unequal division of the overall pot, the law does not require an unequal division if overall considerations render the total resolution just and equitable." *Fobar v. Vonderahe*, 771 N.E.2d 57, 60 (Ind. 2002). The trial court was within its discretion to divide the marital property equally.

## Inclusion of Assets

[37] The parties were separated for over two years before the final property distribution was made. As to the income generated from the five rental

properties during this two-year period, the trial court made the following findings and conclusions:

> Wife agreed that she wanted Husband to claim all of the income and expenses from the rental properties on his 2015 income tax return. Husband did claim the income and expenses of the rental properties in his 2015 income tax return. Husband shall claim all the income and expenses on the rental properties on his 2016 income tax return.

> Wife admitted that the tenant at 700 South was not paying rent since March of 2015. Bridgefield property was also vacant many months due to mold. Other tenants were also behind on rent.

> Neither party presented the Court with accurate information on the rents collected or expenses incurred. Husband reported the income and claimed the expenses on his 2015 taxes but he did not provide the court with a copy of his 2015 income tax return.

> Wife did provide Exhibit "21" and "21A" which indicated that if every tenant paid each month, the parties would collect $4,550.00 per month or $54,600.00 for the year. In 2014 the parties did not collect from every tenant each month and parties reported total rent collection of $50,675.00. Husband provided Exhibit "FFFF" which indicated that in 2015 he collected $47,655.00 in rent.

> In 2014, the parties reported, for tax purposes, net rental income of $13,776. The Court finds that the 2014 net income reported for income tax purposes is the best evidence available for as to [sic] the income from rental properties in 2015 and 2016.

> The Court divides the assets as of the date of filing. The Court is setting over to Husband all of the rental properties. Therefore, all

of the rental income earned during 2015 and 2016 shall be his income and his property. Husband paid the income tax on the rental income and the Court added the net rental income to his income for wages to arrive at his weekly gross income for child support purposes.

(Tr. Vol. I, pg. 15.)

[38] In essence, the trial court deferred to and expanded the parties' partial mediated agreement for 2015. They had agreed that Father would collect rents and report net income on his 2015 personal income tax return. There is no such mediated agreement for 2016. Presumably, Father collected rents and deposited them into the rental account, as no express allegation has been made that he dissipated marital assets. The trial court failed to treat the 2016 rental income, generated from marital property that had not yet been transferred to one party, as marital property. "Indiana's 'one-pot' theory prohibits exclusion of any asset in which a party has a vested interest from the scope of the trial court's power to divide and award." *Wanner v. Hutchcroft*, 888 N.E.2d 260, 263 (Ind. Ct. App. 2008). On remand, the trial court is to treat the 2016 rental income as a marital asset.[6]

[39] Finally, Mother argues that the trial court erroneously included Children's 529 college accounts as divisible marital assets. "529 accounts pertain to education expenses" and are "existing property" with payments "contemplated to be

---

[6] We acknowledge that the rental income allocated solely to Father for child support purposes, that is, $13,776.00, over-stated his 2016 income available for child support and he may be due a credit.

made from the accounts in the future." *Greenan v. Greenan*, 150 Conn. App. 289, 311 (2014), citing 26 U.S.C. § 529. The named custodian owns the property, but it is intended for the benefit of the child. *See id.*

[40] Mother testified that Maternal Grandparents had substantially funded 529 accounts for each child, and Mother and Father had made some ongoing contributions. She further testified that the accounts were to be maintained for funding Children's college educations. Father agreed that the accounts were for college funds, but he requested a custodial allocation on the basis of "her take one – me take one." (Tr. Vol. III, pg. 40.)

[41] The trial court included the two accounts, in the amounts of $39,538.06 and $14,087.14, in the marital pot. It did not err in doing so. *See Trabucco,* 944 N.E.2d at 544 ("because the [college expenses] account was funded with marital assets, the policies behind Indiana's one-pot theory require its inclusion within the marital estate"). However, the trial court treated the accounts as Mother's separate property in the distribution. This is not consistent with the uncontroverted evidence that the 529 funds were solely to be used as college funds for Children. Although the trial court might order one or both parents to act as custodian, neither parent requested the power or right to liquidate the funds or use them for any purpose other than education expenses. On remand, the trial court should set aside the 529 accounts before valuing the distribution to either parent or ordering an equalization payment.

# Conclusion

[42] Mother was not denied due process in the conduct of the final hearing. The award of joint physical custody is not clearly erroneous. The parenting time order should be revised to reflect Mother's updated work schedule and the preference for parental, as opposed to grandparental, access to Children. The trial court's decision to divide the marital property in accordance with the statutory presumption of an equal division is not clear error. However, the trial court erred in excluding rental income for 2016 and treating the 529 accounts as Mother's sole property.

[43] Affirmed in part, reversed in part, and remanded with instructions.

Baker, J., and Altice, J., concur.