Rex E. **BREEDEN REVOCABLE TRUST, Appellant–Plaintiff,**

v.

Rebecca Jane **HOFFMEISTER–REPP, Appellee–Defendant.**

No. 03A04–1003–CT–185.

Court of Appeals of Indiana.

Dec. 6, 2010.

1046

---

Patrick W. Harrison, Columbus, IN, Attorney for Appellant.

Renee J. Mortimer, Scott B. Cockrum, Patrick P. Devine, Hinshaw & Culbertson LLP, Schererville, IN, Attorneys for Appellee.

## OPINION

RILEY, Judge.

### STATEMENT OF THE CASE

Appellant–Plaintiff, Rex E. Breeden Revocable Trust (Trust), appeals the trial court's summary judgment in favor of Appellee–Defendant, Rebecca Jane Hoffmeister–Repp (Hoffmeister–Repp),[1] on the Trust's Complaint for rescission and/or damages of an agreement to purchase a residence.[2]

We affirm.

### ISSUES

The Trust raises three issues on appeal, which we restate as:

(1) Whether the disclosure requirements set forth in Indiana Code chapter 31–21–5, which require the owner of a residence to disclose to a prospective buyer the working condition of certain key household components, apply to Hoffmeister–Repp's sale of her residence to the Trust;

(2) Whether there are genuine issues of material fact regarding the Trust's claim of fraud that would preclude a grant of summary judgment in favor of Hoffmeister–Repp; and

(3) Whether there are genuine issues of material fact establishing that the Trust and Hoffmeister–Repp made a mutual mistake when they entered into an agreement for the sale of the residence under the common assumption that the house was free of moisture problems.

### FACTS AND PROCEDURAL HISTORY

In 1989, Hoffmeister–Repp and her first husband hired Roger Nichter (Nichter) to build a custom, lake-front home in Columbus, Indiana. Hoffmeister–Repp described the residence as:

It is a large gray wood-sided home with white trim. The living level for my husband and myself was the main level. There's a fully finished lake level with two bedrooms, two bathrooms, a finished recreation room. At the time we lived there, there was a hobby room, an unfinished room, and a furnace room in the basement.

(Appellant's App. p. 95). The residence was completed in March of 1990.

Ten months later, in January of 1991, Hoffmeister–Repp was on the lower level of the house when she noticed condensation on the windows. Retrieving a towel to wipe the windows, she looked down through a floor vent and noticed water in the heating duct "down before the duct work would come up to meet the actual

---

1. The instant appeal pertains only to the November 6, 2009 summary judgment order in favor of Hoffmeister–Repp. Ron Hendershot and SLE Home Services, LLC, d/b/a Housemaster Home Inspections were also named defendants in the Trust's amended complaint, however, Hoffmeister–Repp's case was decided separately and therefore she is the only Appellee–Defendant in this appeal.

2. We heard oral argument in this case on October 5, 2010 at the Courtroom of the Indiana Court of Appeals, Indianapolis, Indiana. We thank counsel for both parties for their excellent advocacy.

vent." (Appellant's App. p. 107). Hoffmeister–Repp and her husband called Nichter who pumped out the water. He also installed a sump pump that was connected to drain tiles that went from the downspouts out to the lake. After installation of the sump pump, Hoffmeister–Repp never again noticed water in the ducts.

Following the death of her first husband, Hoffmeister–Repp remarried in 2003 and moved to Florida with her second husband. Because she no longer used the residence, Hoffmeister–Repp decided to sell it. A few months prior to placing the house on the market, Hoffmeister–Repp requested Tom Bonnell (Bonnell) to investigate a "swampy" area in the backyard of the residence. (Appellant's App p. 402). Bonnell had been a construction manager for Cummins Engineer Company for many years and had long been acquainted with Hoffmeister–Repp. In November of 2004, after investigating the swampy section, Bonnell advised Hoffmeister–Repp that her property had a drainage problem.

A few months later, Hoffmeister–Repp presented the residence for sale. In connection with this sale, on February 17, 2005, Hoffmeister–Repp signed a "Seller's Residential Real Estate Sales Disclosure" (Disclosure Form). Section 4 of this Disclosure Form, titled "Other Disclosures," included the question, "[a]re there moisture and/or water problems in the basement, crawl space area, or any other area?" (Appellant's App. p. 371). Hoffmeister–Repp checked the box to answer "no." (Appellant's App. p. 371).

In 2005, Rex Breeden (Breeden), a retired real estate agent, and his wife (collectively, the Breedens) decided to down-size to a smaller home. They looked at three houses before purchasing Hoffmeister–Repp's residence. During the initial tour of the home, Breeden noticed that it needed a new roof and new paint, both inside and out. Additionally, some of the siding had deteriorated, the furnace was old, and the carpeting was bad. Notwithstanding the needed repairs, the Breedens were in hurry to buy a home because they already were under contract to sell their existing residence and they wanted to purchase a house before going to Florida for the winter.

Hoffmeister–Repp placed the residence on the market with a listing price of $849,900, which was later reduced to $799,900. Seven months later, on September 9, 2005, Breeden, on behalf of the Trust, entered into a purchase agreement with Hoffmeister–Repp to purchase her residence for $744,900. This reduced price was based on Hoffmeister–Repp's agreement to give Breeden credit in the amount of $55,000 to make the following repairs: (1) replace the roof, $22,000; (2) replace HVAC units, $11,000; (3) replace carpet, $10,000; (4) paint the windows, $5,000; (5) replace rotted windows, $5,000; and (6) miscellaneous repairs, $2,000. On September 12, 2005, Ron Hendershot (Hendershot) of SLE Services, LLC, d/b/a Housemaster Home Inspections (Housemaster), was hired to inspect the residence on behalf of the Breedens prior to closing. Hendershot inspected Hoffmeister–Repp's residence seven days later. It was Breeden's expectation that Hendershot would "inspect the home for any flaws," so as to protect the Breedens from any surprises. (Appellant's App. p. 170). After the inspection, Breeden received a copy of Hendershot's written inspection report which Breeden read prior to the closing.

During a typical inspection of a house, Hendershot assigns a grade to each of the house's various components. A grade of "satisfactory" indicates that the "element was functional at the time of inspection." (Appellant's App. p. 334). A grade of "fair" means that the element "requires, or had a probability of requiring, monitoring,

maintenance, repair, replacement, and/or other remedial work now or in the near future." (Appellant's App. p. 334). Only those components that receive a "satisfactory" rating are guaranteed by Hendershot. The inspection report concludes:

NOTE: All repair needs or recommendations for further evaluation should be addressed prior to closing. It is the client's responsibility to perform a final inspection to determine house and element conditions at the time of closing. If any decision about the property, or its purchase, would be affected by any condition or the cost of any required or discretionary remedial work, further evaluation and/or contractor cost quotes should be obtained prior to making such decision.

(Appellant's App. p. 334).

After inspecting the house, Hendershot graded the roof as "poor/defective," and recommended that a qualified contractor further evaluate and repair as needed. He graded the siding as fair and commented that "deterioration/decay wood trim noted in areas South; repair as required to prevent water penetration concerns." (Appellant's App. p. 337). According to Hendershot, he informed Breeden to hire someone else to determine if there was actual water penetration.

After the Trust purchased the residence, Breeden became aware of damage to the back part of the house's structural walls and of the defective condition of the duct work used to climatize the residence. He noticed that the duct work was corroded and lying in standing water, which had invaded the trenches.

On January 23, 2008, Breeden, on behalf of the Trust, filed a two-count complaint against Hoffmeister–Repp alleging that (1) Hoffmeister–Repp made statements of material fact in connection with the sale of her residence that constituted fraud, which entitled the Trust to damages or rescission of the purchase agreement; and (2) there was a mutual mistake in the contract, which, under principles of equity, entitled the Trust to rescission of the purchase agreement. On October 20, 2008, the Trust amended its complaint by adding Hendershot and SLE Services, LLC, d/b/a Housemaster as defendants in connection with two additional counts. On April 24, 2009, Hoffmeister–Repp filed a motion for summary judgment. On July 13, 2009, the Trust filed its Response to Hoffmeister–Repp's motion for summary judgment. On October 30, 2009, the trial court held a hearing on the motion and, on November 6, 2009, summarily entered an order granting summary judgment in favor of Hoffmeister–Repp. On December 4, 2009, the Trust filed a motion to correct error, which Hoffmeister–Repp replied to on December 16, 2009. On March 1, 2010, the trial court denied the motion.

The Trust now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I. Standard of Review

The Trust contends that the trial court erred in summarily granting Hoffmeister–Repp's motion for summary judgment. Summary judgment is appropriate only when there are no genuine issues of material fact and the moving party is entitled to a judgment as a matter of law. Ind. Trial Rule 56(C). In reviewing a trial court's ruling on summary judgment, this court stands in the shoes of the trial court, applying the same standards in deciding whether to affirm or reverse summary judgment. *First Farmers Bank & Trust Co. v. Whorley*, 891 N.E.2d 604, 607 (Ind. Ct.App.2008), *trans. denied.* Thus, on appeal, we must determine whether there is a genuine issue of material fact and whether the trial court has correctly applied the law. *Id.* at 607–08. In doing so, we con-

sider all of the designated evidence in the light most favorable to the non-moving party. *Id.* at 608. The party appealing the grant of summary judgment has the burden. of persuading this court that the trial court's ruling was improper. *Id.* When the defendant is the moving party, the defendant must show that the undisputed facts negate at least one element of the plaintiff's cause of action or that the defendant has a factually unchallenged affirmative defense that bars the plaintiff's claim. *Id.* Accordingly, the grant of summary judgment must be reversed if the record discloses an incorrect application of the law to the facts. *Id.* When the parties have filed cross-motions on summary judgment, we consider each motion separately to determine whether the moving party is entitled to judgment as a matter of law. *Id.*

We observe that in the present case, the trial court did not enter findings of fact and conclusions of law in support of its judgment. Special findings are not required in summary judgment proceedings and are not binding on appeal. *Id.* However, such findings offer this court valuable insight into the trial court's rationale for its review and facilitate appellate review. *Id.*

## II. *Residential Real Estate Disclosure Form*

■ Initially, the parties dispute the applicability and meaning of Indiana Code chapter 32–21–5—the Residential Real Estate Disclosure (Disclosure Form). In 1993, our General Assembly enacted Indiana Code sections 24–4.6–2–1 to –13, later recodified at Indiana Code sections 32–21–5–1 to –13, creating a statutory obligation for a seller of residential real estate to provide a prospective buyer with a disclosure form which must include the seller's disclosure of the known condition of, among others, the home's foundation, roof, and structure prior to accepting an offer

for the purchase of the residence. *See* I.C. § 32–21–5–7. In other words, this statute requires disclosure of the kinds of defects that will most significantly affect the value and use of a home. *Dickerson v. Strand,* 904 N.E.2d 711, 717 (Ind.Ct.App.2009) (Vaidik, J., dissenting). However, even though the seller has a statutory duty to disclose, his liability is limited for errors contained in the Disclosure Form. Specifically, I.C. § 32–21–5–11 provides

> The owner is not liable for any error, inaccuracy, or omission of any information required to be delivered to the prospective buyer under this chapter if:
>
> (1) The error, inaccuracy, or omission was not within the actual knowledge of the owner or was based on information provided by a public agency or by another person with a professional license or special knowledge who provided a written or oral report or opinion that the owner reasonably believed to be correct; and
>
> (2) The owner was not negligent in obtaining information from a third party and transmitting the information.

Nevertheless, despite that fact that the Chapter has the all-encompassing title of "Residential Real Estate Sales Disclosure," the statute qualifies and limits its applicability in Indiana Code section 32–21–5–1 as follows:

> (a) This chapter applies only to a sale of, an exchange of, an installment sales contract for, or a lease with option to buy residential real estate that contains not more than four (4) residential dwelling units.
>
> (b) This chapter does not apply to the following:
>
> > (1) Transfers ordered by a court, including transfers:
> >
> > > (A) in the administration of an estate;

(B) by foreclosure sale;

(C) by a trustee in bankruptcy;

(D) by eminent domain;

(E) from a decree of specific performance;

(F) from a decree of divorce; or

(G) from a property settlement agreement.

(2) Transfers by a mortgagee who has acquired the real estate at a sale conducted under a foreclosure decree or who has acquired the real estate by a deed in lieu of foreclosure.

(3) Transfers by a fiduciary in the course of the administration of the decedent's estate, guardianship, conservatorship, or trust.

(4) Transfers made from at least one (1) co-owner solely to at least one (1) other co-owner.

(5) Transfers made solely to any combination of a spouse or an individual in the lineal line of consanguinity of at least one (1) of the transferors.

(6) Transfers made because of the record owner's failure to pay any federal, state or local taxes.

(7) Transfers to or from any governmental entity.

(8) Transfers involving the first sale of a dwelling that has not been inhabited.

(9) Transfers to a living trust.

It is the application of the ninth exception that brings the parties' dispute squarely before this court, presenting us with a matter of first impression. The Trust contends that because Hoffmeister–Repp sold her residence to a living trust, pursuant to the plain, unambiguous meaning of the exception the statute does not apply to this transaction and thus, the Trust is not required to establish that any error or inaccuracy on the Disclosure Form was within the actual knowledge of Hoffmeister–Repp. On the other hand,

Hoffmeister–Repp argues that the legislature intended a logical application of the language used in a statute so as to avoid unjust or absurd results. Mindful of this premise, she offers that application of the ninth exception to the instant situation would be both unjust and absurd as it would permit purchasers of Indiana real estate to avoid the terms of the statute simply by creating a living trust and having that trust act as the purchaser of record for residential real estate. As such, Hoffmeister–Repp claims that the trial court was correct in finding that the transaction was not exempted from the purview of the statute.

First, turning to the statute itself, we find its language to be ambiguous. The initial step in interpreting a statute is to determine whether the legislature has spoken clearly and unambiguously on the point in question. *City of Carmel v. Steele*, 865 N.E.2d 612, 618 (Ind.2007). When a statute is clear and unambiguous, we need not apply any rules of construction other than to require that words and phrases be taken in their plain, ordinary, and usual sense. *Id.* Clear and unambiguous statutes leave no room for judicial construction. *Id.* However, when a statute is susceptible to more than one interpretation it is deemed ambiguous and thus open to judicial construction. *Id.* And when faced with an ambiguous statute, other well-established rules of statutory construction are applicable. *Id.* One such rule is that our primary goal of statutory construction is to determine, give effect to, and implement the intent of the legislature. *Id.* To effectuate legislative intent, we read the sections of an act together in order that no part is rendered meaningless if it can be harmonized with the remainder of the statute. *Id.* We also examine the statute as a whole. *Id.* And we do not presume that the legislature intended language used in a statute to be applied illogi-

cally or to bring about an unjust or absurd result. *Id.*

Here, both parties propose widely different interpretations of the statute's seemingly plain-written ninth exception. Even the trial court appeared unsure of the exception's meaning as it commented during the hearing on the Trust's motion to correct error:

> Okay. Well you, you guys have a difference of interpretation and, and that's fine. I don't believe that the statute does not apply to transfers to trusts, because my reading of that was, it is like if I transfer something from myself to my own trust.

(Appellee's App. p. 122). Thus, even though the exception at issue here appears to be plain, it clearly is susceptible to more than one interpretation and therefore, ambiguous.

Section 1 of the chapter governing the Disclosure Form directs guidance to the seller as to when a Disclosure Form is required. Exceptions to this requirement appear to fall within two categories: first, the exceptions based on a special relationship between the buyer and seller (*i.e.*, the parties are co-owners; family; or there exists a living trust), and second, the exceptions which take into account that the seller is unlikely to have actually lived in the residence such that knowledge of the home's components cannot be assumed (*i.e.*, court-ordered transfers, foreclosure transfers, estate-related transfers, tax sale, transfer to governmental entity, and first sale of an inhabited dwelling). Because I.C. § 32–21–5–10 requires this Disclosure Form to be completed and signed prior to an offer for the sale of the residence is accepted, the ninth exception—transfer to a living trust—can necessarily only come into play if the residence is purchased by the seller's own living trust. If the sale is occasioned between a seller and a non-related living trust, the seller will always include a Disclosure Form as he is unaware as to the identity of the prospective buyer. In particular, Hoffmeister–Repp, in the understanding that she was required to complete a Disclosure Form, filled out the form on February 15, 2005, well before she was informed that a living trust might purchase her residence. Furthermore, the exceptions all are couched in terms of a "transfer," not a sale (except the eight exception—"transfer involving the first *sale* of a dwelling that has not been inhabited").

■ Moreover, if we interpreted the transfer to a living trust exception to include transfers to a living trust that is not related to the seller, it would permit a prospective buyer of a residence to easily avoid the application of the statute by creating a living trust for the sole purpose of the purchase. In this event, the buyer would circumvent the high burden of having to establish "actual knowledge" or "negligence" in order to hold the seller accountable for errors in the Disclosure Form. *See* I.C. § 32–21–5–11. This result cannot be one envisioned by the legislature. Therefore, we conclude that exception nine—transfers to a living trust—enacted in I.C. § 32–21–5–1(9) only applies when the transfer occurs between a seller and the seller's own living trust. This is clearly not the case here, therefore, Hoffmeister–Repp was required to comply with the statute and to complete a Disclosure Form.

### III. *Fraud*

■ However, this does not conclude our analysis. Mindful that the statute applies to the sale before us and the Trust has to establish actual knowledge to hold Hoffmeister–Repp liable, the Trust contends that Hoffmeister–Repp knowingly lied when she filled out the Disclosure Form and checked off that she had no

"CURRENT ACTUAL KNOWLEDGE" of "moisture and/or water problems in the basement, crawl space area, or any other area" and no "CURRENT ACTUAL KNOWLEDGE" OF "structural problems with the building." (Appellant's App. p. 371). In other words, the Trust claims that Hoffmeister–Repp should be held liable for fraud for alleged fraudulent statements made on the Disclosure Form.

■ To establish a cause of action for fraudulent misrepresentation, the Trust must demonstrate that (1) Hoffmeister–Repp made false statements of past or existing material facts; (2) Hoffmeister–Repp made such statements knowing them to be false or recklessly without knowledge as to their truth or falsity; (3) Hoffmeister–Repp made the statements to induce the Trust to act upon them; (4) the Trust justifiably relied and acted upon the statements; and (5) the Trust suffered injury. *Verrall v. Machura*, 810 N.E.2d 1159, 1162 (Ind.Ct.App.2004), *trans. denied.*

Reviewing the designated evidence, Breeden testified as follows in his deposition:

Q  Well Mr. Breeden, let me ask you this: Is it your allegation in this case that [Hoffmeister–Repp] knew there was this rotting going on in the exterior walls?

A  No.

. . .

Q  Tell me, what are you saying? What's the basis of your belief that [Hoffmeister–Repp] is responsible for paying your damages in regards to the exterior walls?

A  It's not what I bought. It's just a totally flawed piece of merchandise.

(Appellant's App. pp. 176–77). We find that Breeden's admission of Hoffmeister–Repp's lack of knowledge regarding the damage to the exterior walls falls short of the proof required for fraud as to damage to the structural integrity of the residence.

With respect to the moisture in the air ducts, Hoffmeister–Repp testified by deposition that she did not know when she sold her home that the duct work was defective and in need of repair. When questioned about the underground duct work, Hoffmeister–Repp answered:

Q  Real briefly, [ ], my colleague for the plaintiff was asking you questions about what happened back in 1990 and 1991 and was asking you about the duct work. Was it your understanding that everything that needed to be fixed was fixed by Nichter?

A  Yes, it was.

Q  You didn't have any reason to believe that anything else needed to be fixed after he did what he did; is that right?

A  That's correct, I depended on him. We depended on him. My husband was alive at that point.

. . .

Q  [Hoffmeister–Repp], when you sold the home, did you know that the duct work was defective and needed to be repaired?

A  I did not.

(Appellant's App. pp. 120–21).

Also, Breeden himself fails to establish that Hoffmeister–Repp knew the ducts were rotten at the time of sale. Asked if he thought Hoffmeister–Repp was attempting to dump the house on him, he replied that it was doubtful that she "went through that thought process," but raised the inference that she "knew they had been full of water[,] [a]nd 17 years later or 18, it would have to be rusty and rust through." (Appellant's App. p. 186). However, although Hoffmeister–Repp in her deposition acknowledged that she noticed water in the air ducts in the early

1990s, she added that she had solved that problem. She explained that she had employed Nichter to pump out the water and to install a sump pump. Hoffmeister–Repp testified that it was her understanding that Nichter had fixed everything that needed to be fixed. After the repair, she would occasionally look into the vents but never saw water again. Therefore, when she checked the box on the Disclosure Form indicating that there was no moisture, she did not know of any problems. Even Breeden admitted that Nichter "has an outstanding reputation" and he "wouldn't have expected [Nichter] to do a half-baked remedial job in terms of fixing this water in the vents." (Appellant's App. p. 192).

Based on the designated evidence before us, we conclude that the Trust failed to show that Hoffmeister–Repp had actual knowledge of the moisture problems in the duct work at the moment she completed the Disclosure Form. Thus, finding no genuine issue of material fact, we hold that the Trust's fraud claim fails.

### IV. *Mutual Mistake*

■ Raising an alternative argument, the Trust contends that if Hoffmeister–Repp did not know of the moisture problems, then both parties shared a common assumption that the residence was dry, and therefore, discovery of the moisture problems by both parties constitutes a mutual mistake which should result in a rescission of the purchase agreement.

■ The doctrine of mutual mistake provides that where both parties share a common assumption about a vital fact upon which they based their bargain, and that assumption is false, the transaction may be avoided if because of the mistake a quite different exchange of values occurs from the exchange or values contemplated by the parties. *Perfect v. McAndrew*, 798 N.E.2d 470, 478 (Ind.Ct.App.2003). It is not enough that both parties are mistaken

about any fact; rather, the mistaken fact complained of must be one that is "of the essence of the agreement, the *sine qua non*, or as is sometimes said, the efficient cause of the agreement and must be such that it animates and controls the conduct of the parties." *Id.* (quoting *Bowling v. Poole*, 756 N.E.2d 983, 989 (Ind.Ct.App. 2001)). Thus, in light of this general rule, the issue becomes whether the lack of moisture constitutes a vital fact upon which the parties based their bargain.

Here, the parties entered into an agreement to purchase a residence in exchange for a certain purchase price. In particular, Breeden, on behalf of the Trust, agreed to buy Hoffmeister–Repp's house for a total price of $744,900, in exchange for Hoffmeister–Repp's agreement to allow a credit of $55,000 to make certain repairs. Prior to closing the purchase agreement, Breeden read Hendershot's Inspection Report which clearly indicated that the house's south-side siding was deteriorated and advised Breeden to hire an expert to determine if there was actual water penetration. Even though Breeden was put on notice about possible moisture issues with the residence prior to closing the sale, the parties nevertheless executed the purchase agreement. Therefore, it is apparent that the possible existence of moisture in the residence was never the essence of the parties' agreement. *See Perfect*, 798 N.E.2d at 478. At most, the evidence points to a unilateral claim of inattentiveness on Breeden's part. Thus, we conclude that there is insufficient designated evidence to support a finding of mutual mistake.

### CONCLUSION

Based on the foregoing, we conclude that the trial court properly granted sum-

mary judgment in favor of Hoffmeister–Repp.

Affirmed.

KIRSCH, J., and BAILEY, J., concur.