

IN THE

# Court of Appeals of Indiana

Lester L. Sumrall,

*Appellant-Defendant/Counterclaim Plaintiff*

v.

LeSEA, Inc.,

*Appellee-Plaintiff/Counterclaim Defendant*



FILED

Apr 30 2024, 9:04 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

---

April 30, 2024

Court of Appeals Case No.
23A-PL-2214

Appeal from the St. Joseph Circuit Court

The Honorable John E. Broden, Judge

Trial Court Cause No.
71C01-1903-PL-84

---

**Opinion by Judge Crone**
Judges Bailey and Pyle concur.

**Crone, Judge.**

## Case Summary

[1] Lester L. Sumrall (Lester) appeals an order granting a motion for judgment lien on real estate in favor of LeSEA, Inc. (LeSEA). Lester also appeals the denial of his motion to continue a hearing. We affirm.

## Facts and Procedural History

[2] In an unpublished decision, a different panel of our Court provided a detailed history of the events that ultimately led to the current appeal. *See Sumrall v. LeSEA, Inc.*, No. 22A-PL-45, 2022 WL 17749955, at *1-5 (Ind. Ct. App. Dec. 19, 2022) (*Sumrall 1*). We recite pertinent highlights. In March 2016, almost forty years after certain "bonds became due and well after the [six-year] statute of limitations had expired," Lester filed a bond debt notice against LeSEA. *Id.* at *7. In the notice, which was filed with the St. Joseph County Recorder, Lester asserted that a $172,967.69 debt was "now due and owing." *Id.*

[3] In a warranty deed dated November 6, 2018, Ryan T. Marcott conveyed and warranted certain real property, 53646 Bridgewater Court, in Elkhart County (the Bridgewater Property) to Lester for ten dollars and other valuable consideration. Appellant's App. Vol. 2 at 119, 122-24. The warranty deed originally identified Lester "and Sarah Sumrall, Husband and Wife," as grantee, but the quoted language was scratched out and initialed. *Id.* at 122. The identity of the person who initialed the change is unclear, as is the reason for the change. On November 15, 2018, "Lester Sumrall, A Married Man[,]"

was identified as the sole borrower on a mortgage taken out on the Bridgewater Property. *Id.* at 109. On November 20, 2018, Lester executed and submitted to the Elkhart County Recorder a quitclaim deed. Lester was listed as the "Owner" who quitclaimed the Bridgewater Property to "Lester L. Sumrall and Sarah J. Sumrall, as Co-Trustees of The Lester and Sarah Sumrall Trust dated November 19, 2018 [hereafter, the Sumrall Trust], *for no consideration*[.]" *Id.* at 101.

[4] The Sumrall Trust, which is dated November 19, 2018, and was signed by Lester and Sarah, identifies Lester and Sarah as "both Settlors and Co-Trustees." *Id.* at 130. The Sumrall Trust provides in pertinent part as follows:

> The Settlors reserve the right and power, jointly or individually, at any time and from time to time while living to revoke in whole or in part this Trust and to withdraw any … property … belonging to the trust estate or any part thereof; or to alter or amend any term or provision of the Trust, except that the Settlors shall have no power to change the duties of the Trustee without the Trustee's written consent. During the lifetime of the Settlors, the Trustee shall distribute to the Settlors, or as either of the Settlors may otherwise direct in writing, the net income of the Trust, and the Trustee shall pay any or all of the principal of the Trust as either of the Settlors may direct in writing.

*Id.* at 131. In addition, the document provides that upon the death of the surviving settlor, the Sumrall Trust "shall thereafter be irrevocable and not subject to alteration or amendment by any person." *Id.* at 132. The Sumrall Trust further provides that after the death of both Lester and Sarah, their children shall be the residual beneficiaries. *Id.* at 135-36.

Circling back to the $172,967.69 bond debt notice, in 2019, LeSEA filed a complaint against Lester in St. Joseph County. LeSEA sought a declaratory judgment and argued that Lester had slandered title to LeSEA's real property by recording an invalid bond notice. Lester lodged counterclaims, which requested declaratory relief and specific performance and alleged that LeSEA had breached a contract by failing to redeem the bonds.

In 2020, the trial court granted summary judgment to LeSEA in its slander of title action. In October 2021, the trial court issued an "order granting [prevailing party] LeSEA $136,721.98 in attorney fees" (Original Attorney Fees). *Sumrall 1*, 2022 WL 17749955, at *1. As for Lester's breach of contract counterclaim, the trial court granted summary judgment in favor of LeSEA in December 2021. Lester appealed.

In its December 2022 decision, the *Sumrall 1* panel reiterated evidence that Lester had recorded the false bond debt notice, that "a sale of certain property was unable to close until the Bond Debt Notice was released," and that, consequently, LeSEA incurred substantial legal expenses to secure the release. *Id*. at *7. Concluding that summary judgment was appropriate in both instances and finding no abuse of discretion in the award of Original Attorney Fees, the *Sumrall 1* panel affirmed.

On May 1, 2023, LeSEA filed with the trial court a motion for additional attorney fees (Appellate Attorney Fees) generated by the *Sumrall 1* appeal. On or about June 12, 2023, Lester filed a motion arguing against Appellate

Attorney Fees. On June 13, 2023, LeSEA filed its "Motion for Judgment Lien on Real Estate," which referenced the judgment of Original Attorney Fees, requested that the trial court enter a lien on the Bridgewater Property, and included exhibits. Appellant's App. Vol. 2 at 99. On June 15, 2023, LeSEA filed a motion requesting leave to file a reply in support of its motion for Appellate Attorney Fees. On June 16, 2023, Lester filed a motion stating that he had no objection to LeSEA filing a reply. He also asked the trial court to set the matter for a hearing and require that all briefs be submitted "within ten (10) days of the hearing." *Id*. at 151.

[9] On June 20, 2023, the trial court granted leave to LeSEA to file a reply in support of its motion for Appellate Attorney Fees. Also on June 20, the trial court scheduled an August 1, 2023 hearing to be conducted via Zoom (Zoom hearing). On June 21, 2023, Lester filed both an objection to LeSEA's motion for judgment lien against the Bridgewater Property and a motion requesting that the matter be set for hearing "no sooner than forty-five (45) days from the filing of this Motion, with briefs and arguments on the issues due ten (10) days before the hearing." *Id*. at 154.

[10] One week prior to the Zoom hearing, Lester filed a motion to continue it. In his motion, Lester asserted that time constraints prohibited him from presenting testimony at a July 2023 hearing[1] and that he would be unable to attend the

---

[1] On appeal, no transcript of a July 2023 hearing has been included.

Zoom hearing because he would be out of the country "on a speaking engagement[.]" *Id.* at 170. On July 26, 2023, Lester filed a brief addressing Appellate Attorney Fees and a separate brief concerning the judgment lien on the Bridgewater Property. Also filed that same day was LeSEA's objection to Lester's motion to continue the Zoom hearing. LeSEA contended, inter alia, that time was of the essence because at the July hearing, Lester had "testified that he may be filing bankruptcy[.]" *Id.* at 177.

[11] On July 28, 2023, the trial court entered an order denying Lester's motion for continuance. Within its order, the trial court found that the hearing had been set more than a month ago and reiterated that it would be conducted via Zoom. The trial court further found that "no testamentary evidence will take place, but instead the Court will hear argument from counsel on the fully briefed Motions." *Id.* at 50.

[12] At the Zoom hearing, the trial court heard argument from counsel and took the matter under advisement. In an August 23, 2023 order, the trial court granted LeSEA's motion for Appellate Attorney Fees, halved the requested amount, and explained its reasoning as follows:

> The Court believes it is of critical importance that [Lester] is not assessed any attorney fees for professional services unrelated to the slander of title issue. Therefore, in an abundance of caution to insure [Lester] is not assessed any attorney fees for work performed by [LeSEA's] counsel unrelated to the slander of title issue, the Court reduces the global fee for the professional services proved by [LeSEA's] counsel by **Fifty Per Cent (50%)**.

> Thus, [LeSEA's] Motion for Appellate Attorney Fees is **GRANTED** but in the amount of **$12,384.75**.

Appealed Order at 5. The trial court also granted LeSEA's motion for judgment lien on the Bridgewater Property. Without "questioning [Lester's] motives for placing [the Bridgewater] property in a trust," the trial court concluded that "the legal impact of placing the real property in a revocable trust where the Trust instrument freely allows the property to be removed from the Trust at any time is much different than placing the real property in an irrevocable trust." *Id*. at 6-7.

[13] On September 20, 2023, Lester filed a notice of appeal that identified only the August 23 order. Lester filed his appellant's brief, and LeSEA filed its appellee's brief. Lester filed his reply brief. LeSEA filed a motion to strike the reply brief or, alternatively, for leave to file a surreply. Lester filed an answer to LeSEA's motion. We denied the motion to strike and granted leave to file a surreply.

## Discussion and Decision

## Section 1 – Lester has not demonstrated that the entry of a judgment lien violated due process.

[14] Lester intertwines due process concerns with the denial of his motion to continue the Zoom hearing. The standard of review for due process is well settled. "Whether a party was denied due process is a question of law that we review de novo." *Miller v. Ind. Dep't of Workforce Dev.*, 878 N.E.2d 346, 351 (Ind. Ct. App. 2007). "The fundamental requirement of due process is the

opportunity to be heard at a meaningful time and in a meaningful manner." *NOW Courier, Inc. v. Rev. Bd. of Ind. Dep't of Workforce Dev.*, 871 N.E.2d 384, 387 (Ind. Ct. App. 2007).

[15] Lester argues that the trial court "violated the Fourteenth Amendment due process rights of [him] and the [Sumrall] Trust by not allowing them their day in court to present evidence in opposition to LeSEA's motion seeking a judgment lien against the" Bridgewater Property. Appellant's Br. at 9. Though confusingly worded, Lester's brief specifically states that the Sumrall Trust includes Sarah as a person "having an interest in the [Sumrall] Trust property," and he consistently refers to her as co-settlor and co-trustee. *Id.* at 4 n.1. Lester contends that the Sumrall Trust "would be considered a person separate and distinct from [him] and therefore entitled to due process[.]" *Id.* at 10. He maintains that the judgment lien should be vacated because the record does not show that the Sumrall Trust was a party to the litigation, let alone "noticed of the lawsuit, or allowed to present evidence[.]" *Id*. at 11.

[16] LeSEA maintains that any argument concerning Sarah's rights is waived and/or cannot be raised by Lester. According to LeSEA, Lester did not argue Sarah's interest before the trial court and did not develop an argument regarding her rights in his initial appellant's brief. We disagree and point to Lester's counsel's argument at the August 23, 2023 hearing:

> I believe that this case is distinguishable [from *Fulp v. Gilliland*, 998 N.E.2d 204 (Ind. 2013)] because who were the settlors? It was both–both Mr. Sumrall [Lester] and Mrs. Sumrall [Sarah].

They're co-settlors. The document which–even now if the Court saw a copy of it, it says that they're co-settlors. And the reason they're co-settl[or]s is the money to purchase the home, the down payment anyway, was from –was from Sarah Sumrall. So, they're co-settlors.

Then the next thing that we find out is that they're co-trustees. And it goes to … it gives Lester the right to revoke the trust, take property out of the trust. I'm not disputing that. But it also gives his wife Sarah the same–the same thing. Same power.

Also in the trust it's clear from a reading of the trust that the house was put into the trust for a place for the family to live. That would include these children of the trust. The only reason they put in there the revocable nature of the trust, as far as to allow them to sell the house in case they … moved into another house[.] But the primary reason for the trust was to establish a succession of the trust to both of–if both of them died it would go to the children[.]

Tr. Vol. 2 at 16-17. Lester's counsel suggested that "the property that [LeSEA wants] to go after, which is in the Lester and Sarah Sumrall trust they've never been a party to this action. So their property rights are being decided by this Court without them even being a party to it." *Id*. at 18. LeSEA's more persuasive argument questions whether Lester can claim a violation of Sarah's due process rights on her behalf.

[17] Regardless of the packaging, the crux of this case concerns one complex question: whether a judgment holder may satisfy that judgment by securing a judgment lien upon real property within a revocable trust, when the judgment was against one co-trustee, co-settlor, and beneficiary of the trust, in his

individual capacity, yet the judgment holder does not include the other co-settlor, co-trustee, or the trust itself as a party. Neither Lester nor LeSEA has presented any Indiana caselaw exactly on point, but each relies to some degree on *Kesling v. Kesling*, 967 N.E.2d 66 (Ind. Ct. App. 2012), *trans. denied*.

[18] *Kesling* involved a closely held corporation (TPO), questionable stock purchase agreements and transfers, and a debate about ownership status when stock is placed in a trust. In March 2001, family member and shareholder Andrew Kesling placed his TPO corporate voting stock into the "Andrew C. Kesling Trust," a revocable trust of which he was the sole settlor, trustee, and beneficiary, with the right to amend, modify, or revoke the trust at any time. *Id*. at 70-71. In June 2004, Peter Kesling sold 5,410 TPO shares to Andrew, whom Peter believed to be a TPO shareholder. Yet, the documents memorializing the sale indicated that the stock was being transferred into Andrew's trust. TPO shareholders brought an action against Andrew, his trust, and Peter Kesling, seeking a declaration that a transfer of stock from Peter to Andrew was a violation of the TPO shareholder agreement because Andrew was not a shareholder at the time of the transfer. Peter cross claimed against Andrew for rescission of the stock purchase agreement. After a bench trial, a judgment was entered providing for rescission of the stock purchase agreement. Andrew appealed.

[19] In *Kesling*, we noted a prior case that had referred to an inter vivos, revocable trust as a tool for estate planning and a "unique legal entity." *Id*. at 80 (citing *In re Walz*, 423 N.E.2d 729, 732 (Ind. Ct. App. 1981)). We also quoted extensively

from the Restatements of Trusts, one of which described the creation of a trust as a "method of disposing of property." *Id.* at 80-81 (citing Restatement (Second) of Trusts intro. note (1959)). The introductory note to Chapter 21 of the Restatement (Third) of Trusts (2007) had this to say on the subject:

> Technically, the trust is still not generally recognized as a legal "entity," but it is generally for federal tax purposes, and in practice trustees act on behalf of their trusts and are sued as trust representatives. Indeed, in this Chapter and elsewhere in this country, the trust is treated as an entity to such an extent that it is no longer inappropriate to refer to claims against or liabilities of a "trust" (as in the title and content of this Chapter) and to the liability or debt of a beneficiary to a "trust" (as in Chapter 20), or to refer to and treat trusts, in law and in practice, as if they were entities in numerous other contexts.

[20] In *Kesling*, we further observed that "the legal status of a trust is an evolving concept" and noted "Indiana case law in which a revocable trust itself has been listed as a party to a lawsuit, rather than listing the trustee acting on behalf of the trust as the party." 967 N.E.2d at 82 (citing *Breeden Revocable Tr. v. Hoffmeister-Repp*, 941 N.E.2d 1045 (Ind. Ct. App. 2010), and *Barkwill v. The Cornelia H. Barkwill Revocable Tr.*, 902 N.E.2d 836 (Ind. Ct. App. 2009), *trans. denied*); *see also Cain v. William J. Huff, II Revocable Tr. Declaration, Dated June 28, 2011*, 149 N.E.3d 645 (Ind. Ct. App. 2020), *trans. denied*. However, we then clarified that "regardless of the legal position occupied by a revocable trust in Indiana," we were addressing a different question. 967 N.E.2d at 82. That is, we examined "whether, under the circumstances … Andrew's Trust Declaration establishing a revocable trust in which he is the settlor, trustee, and

a beneficiary, constituted a transfer to a non-shareholder under TPO's by-laws and the Shareholder Agreement and extinguished his 'ownership' over those assets, and thus whether Andrew ceased" being a shareholder of TPO after a certain date. *Id*. We held that Andrew's trust declaration did not extinguish his rights as a TPO shareholder, that there was no mutual mistake of fact upon which to base an order of rescission in favor of Peter, and that the trial court abused its discretion when it ordered the shares returned to Peter. *Id*. at 86.

[21]     LeSEA reads *Kesling* as holding that Andrew was still the owner of the shares he placed in his trust "because he was the settlor, trustee, and beneficiary of the revocable trust and retained for himself the right to amend or revoke the trust at any time." Appellee's Br. at 16. LeSEA's restatement of our *Kesling* holding is not wrong but does highlight a distinction between *Kesling* and the case we address today. *Kesling* did not involve a trust with co-settlors, co-trustees, and multiple beneficiaries but concerned just one person (Andrew) in multiple roles. And, although we commented that the assets held in Andrew's trust were "reachable by Andrew's potential creditors[,]" we were not squarely faced with a judgment holder seeking assets from Andrew's trust. *See* 967 N.E.2d at 84 (citing spendthrift provision, Ind. Code § 30-4-3-2(b), and various cases outside Indiana).

[22]     LeSEA also cites *Fulp*, 998 N.E.2d 204, for support. In that case, "Ruth Fulp placed her family farm in a revocable trust, reserving the right to revoke or amend the trust and to use its assets–with any remaining trust assets going to her three children upon her death." *Id*. at 205. A few years later, Ruth decided

to sell the farm to her son for a low price, use the proceeds to pay for her retirement-home care, and keep the farm in the family. Nancy, Ruth's daughter, "argued that a bargain sale would breach Ruth's fiduciary duty to her children and deprive Nancy of 'her share' of the trust." *Id*. *Fulp* addressed this novel question: "[W]hile a revocable trust is revocable, whom does the trustee serve?" *Id*.

[23] *Fulp* included the following explanation of revocable trusts:

> Revocable trusts have become popular estate planning tools and substitutes for wills because they allow settlors to avoid probate and guardianship, to have greater privacy, and to manage their assets. John J. Barnosky, *The Incredible Revocable Living Trust*, 10 J. Suffolk Acad. L. 1, 1–15 (1995). Like other trusts, a revocable trust "is a fiduciary relationship between a person who, as trustee, holds title to property and another person for whom, as beneficiary, the title is held." *See* Ind. Code § 30-4-1-1(a) (2004). A settlor creates a revocable trust by executing the trust agreement, at which time the trustee takes legal title to the property, and the beneficiary takes equitable title. *Breeze v. Breeze*, 428 N.E.2d 286, 287 (Ind. Ct. App. 1981); *see* I.C. § 30-4-1-1(a). But unlike other trusts, settlors of revocable trusts continue using the trust property during their lives and retain the power to revoke or amend the trust at any time. *Kesling v. Kesling*, 967 N.E.2d 66, 80, 86 (Ind. Ct. App. 2012), *trans. denied*. And unlike a will, upon the settlor's death, the "trust property is not in the decedent-settlor's estate." *In re Walz*, 423 N.E.2d 729, 732 (Ind. Ct. App. 1981).

*Id*. at 207. Our supreme court concluded that "while a trust is revocable, the trustee's duty is only to the settlor[.]" *Id.* at 209 (citing then-newly amended Ind. Code § 30-4-3-1.3(a)). Thus, Ruth as trustee owed a duty to herself as the

trust's settlor and primary beneficiary but did *not* owe a duty to the remainder beneficiary children. *Id*. at 210. Accordingly, she "was free to sell her farm as trustee for whatever price she desired, without breaching a duty to her children." *Id*. at 205.

[24] We agree with *Fulp*'s holding as well as its general statements about revocable trusts. However, like *Kesling*, *Fulp* is not conclusive here. Ruth did not have a co-settlor or co-trustee, and no judgment holder was making a claim upon the farm asset within her revocable trust.

[25] LeSEA points us to *Marshall County Tax Awareness Committee v. Quivey*, 780 N.E.2d 380 (Ind. 2002). *Marshall County* addressed whether a settlor's interest in real estate established residency sufficient to allow the settlor (Good) to sign a remonstrance petition to block a school building improvement plan. Our supreme court stated: "We think it was clear enough who Good was and that, as trustee of a revocable trust created by himself and his wife, he was an owner of property within the district." *Id*. at 385. The *Marshall County* court had no trouble concluding that a co-trustee husband was an owner of real property within his and his wife's revocable trust. Our supreme court was not faced with whether the holder of a judgment against Good could have enforced a judgment lien against real property within his and his wife's trust, but the *Marshall County* language tends toward that conclusion.

[26] In addition, LeSEA cites several non-Indiana cases,[2] the most compelling of which is *Pandy v. Independent Bank*, 372 P.3d 1047 (Colo. 2016). *Pandy* reviewed whether "the court of appeals erred in holding that property titled in the name of a judgment debtor's co-settled, revocable trust can also be the debtor's property and is therefore subject to liens obtained by his judgment creditors pursuant to section 13-52-102(1), C.R.S. 2015." *Id.* at 1048 n.1. Colorado's supreme court summarized the case as follows:

> The petitioners, Joseph T. Pandy and Elizabeth Pandy, are co-settlors and co-trustees of a revocable trust that holds title to certain real property in Colorado. The respondent, Independent Bank (the "Bank"), obtained two judgments against Mr. Pandy in Michigan. After domesticating those judgments in the district

---

[2] *In re Est. of Nagel*, 580 N.W.2d 810 (Iowa 1998) (allowing auto accident victim's estate to reach corpus of trust belonging to deceased husband and deceased wife); *In re Nielsen*, 526 B.R. 351 (Bankr. D. Haw. 2015) (co-settlor and co-trustee husband and wife were both parties in bankruptcy); *In re Tougas*, 338 B.R. 164 (Bankr. D. Mass. 2006) (holding that because debtor, as co-settlor and sole trustee of trust, retained broad power to alter and amend trust and retained incidents of ownership of trust res, the trust and trust res were property of debtor's bankruptcy estate; debtor also ignored provisions of trust); *In re Luedke*, No. 20-20729, 2020 WL 4342242 (Bankr. E.D. Wis. July 28, 2020) (citing Wisconsin statute that explicitly states that "[d]uring the lifetime of the settlor, the property of a revocable trust is subject to claims of the settlor's creditors" and addressing whether husband and wife, who were settlors, beneficiaries, and trustees of revocable trust, could claim homestead exemption on real property in bankruptcy context); *Boshernitsan v. Bach*, 276 Cal. Rptr. 3d 109, 117 (Cal. App. 2021) (holding that trustees of revocable living trust who were also trust's settlors and beneficiaries qualified as "landlord" under family move-in provision of city's rent control ordinance); *Soto v. First Gibraltar Bank, FSB San Antonio*, 868 S.W.2d 400 (Tex. App. 1993) (holding that bank had right to offset revocable trust funds against debt of depositor, who was trust's settlor; also noting bank's right to apply depositor's general deposit to an indebtedness that depositor owed bank on another account); *Littell v. Law Firm of Trinkle*, No. 8:03-cv-2539, 2009 WL 10706315 (M.D. Fla. Feb. 13, 2009) (concluding that trust provision unambiguously expressed settlors' intent to give surviving settlor power to amend trust, including changing beneficiary, thus law firm did not neglect professional duty by drafting and executing trust amendments), *aff'd*, 345 F. App'x 415 (11th Cir. 2009); *Tseng v. Tseng*, 352 P.3d 74, 75 (Or. Ct. App. 2015) (addressing "whether and to what extent, after a settlor's death, ORS 130.710(1) requires a trustee of a revocable trust to provide beneficiaries of the trust with information about the administration of the trust during the settlor's lifetime"), *rev. den.*; *Mickam v. Joseph Louis Palace Tr.*, 849 F. Supp. 516 (E.D. Mich. 1993) (citing Michigan statute for rule that revocable trust is not a separate legal entity regarding creditor); *United States v. Peelle*, 159 F. Supp. 45 (E.D.N.Y. 1958) (applying New York statute).

court for Grand County, Colorado and recording transcripts of the Colorado judgments with the Grand County Clerk and Recorder, the Bank filed the present action to quiet title and for a decree of foreclosure.

The Pandys subsequently moved for judgment on the pleadings, arguing that the Bank's complaint was barred by what they argued was the applicable statute of limitations, namely, the three-year statute set forth in section 13-80-101(1)(k), C.R.S. (2015). The district court denied the Pandys' motion, and the Pandys brought an interlocutory appeal in the court of appeals. A division of that court affirmed the district court's denial of the motion for judgment on the pleadings[.]

We now affirm. We conclude that as a settlor of a revocable trust, Mr. Pandy held an ownership interest in the trust's assets. Accordingly, the Bank could properly seek to enforce its judgment against Mr. Pandy in this case, and its action was not barred by the statute of limitations set forth in section 13-80-101(1)(k).

*Id*. at 1048 (citation and footnote omitted). Thus, even though it was Mr. Pandy (and not Mrs. Pandy) who owed the debts to the Bank, the Bank was able to reach property within the co-settlors' and co-trustees' trust. The Bank did so by domesticating the judgments, recording the judgments, filing to quiet title, and then foreclosing. *Pandy* comes closest to the present situation, and, as such, we find it instructive.

[27] LeSEA offers a related policy argument as well. LeSEA asserts that should we affirm, we would comport with policy that "a debtor may not tie up his or her property in a trust in such a way as to allow the debtor to enjoy the property

while preventing his or her creditors from reaching it." LeSEA's Surreply at 8 (citing *Pandy*, 372 P.3d at 1050). LeSEA goes further, stating that Lester's transfer of the Bridgewater Property into the Sumrall Trust for no consideration "may well have been voidable as a fraudulent transfer to avoid his creditors' claims." *Id*. LeSEA asserts that our Court "should not countenance Lester's abuse of the trust system to avoid answering for the trial court's judgment against him." *Id*. at 9.

[28] Lester and Sarah set up the Sumrall Trust on November 19, 2018. Lester quitclaimed the Bridgewater Property to the Sumrall Trust on November 20, 2018. The quitclaim deed was duly recorded. These actions were completed almost three years before the six-figure judgment for Original Attorney Fees was entered against Lester in October 2021 and almost five years before the Appellate Attorney Fees award was entered in 2023. Absent clairvoyance by Lester and Sarah, their creation of a family trust and the placement of their family house within it would not seem to be an abuse of the trust system, a fraudulent transfer, or a nefarious way to tie up property to prevent a creditor from reaching it. Instead, it is entirely conceivable that it was garden variety estate planning.

[29] Regardless of the original reason(s) for its creation, the revocable Sumrall Trust has two co-settlors and co-trustees, each of whom reserves "the right and power, jointly or individually, at any time and from time to time while living to revoke in whole or in part" the Sumrall Trust and "to withdraw any … property … belonging to the trust estate or any part thereof; or to alter or amend any

term or provision of the Trust[.]" Appellant's App. Vol. 2 at 131. Thus, per the Sumrall Trust's terms to which Lester and Sarah agreed, Lester and Sarah each have ownership interests in the property within the Sumrall Trust. As of November 20, 2018, the Bridgewater Property became property of the revocable Sumrall Trust. Accordingly, Lester has the right and power to, at any time, revoke the Sumrall Trust or withdraw the Bridgewater Property. Sarah has the identical right and power. These powers of withdrawal of property may be exercised individually by either Lester or Sarah.

[30] Such ownership rights within a revocable trust cannot exist in a vacuum. The flip side of an owner's right to withdraw property must be that the property over which the owner has rights is also available to creditors. Because each of the settlors has ownership rights, the holder of a valid judgment against either owner may seek a judgment lien upon property within the revocable trust. Applied here, Lester, as an owner of this revocable trust, holds an ownership interest in the Sumrall Trust's assets. Because the Sumrall Trust's property includes the Bridgewater Property, LeSEA could seek to enforce its judgment against Lester via a lien on the Bridgewater Property without violating notions of due process. Our conclusion comports with *Pandy* and is consistent with *Kesling*, *Fulp*, and *Marshall County*.

[31] As for Lester's contention that LeSEA's naming of only Lester as a party somehow violated Sumrall Trust's or Sarah's due process rights, we disagree with the idea that the due process rights of any person or entity besides Lester were implicated. No precedent has been cited that indicates that in a creditor's

action to collect on a judgment against one co-settlor or co-trustee of a revocable trust, the creditor must name each settlor/trustee as well as the trust itself. Had this been an action against only one of the Sumrall Trust's trustees for breach of trust administration, a different conclusion might be warranted. Here, however, LeSEA's judgment is against Lester for actions he took in his own individual, non-trustee capacity. As such, LeSEA's choice to name only Lester does not involve due process rights of any person or entity besides Lester.[3] To the extent that Sarah's ownership interests in the Sumrall Trust, and in the Bridgewater Property in particular, may be imperiled by LeSEA's judgment lien, the language of the revocable Sumrall Trust and Lester's actions set the stage for this predicament. And, any due process rights belonging to Sarah were not Lester's to raise. *See Richardson v. Richardson*, 34 N.E.3d 696, 702 n.3 (Ind. Ct. App. 2015) ("Constitutional rights are personal to an individual[.]").

## Section 2 – Lester has not demonstrated that the trial court abused its discretion in denying his motion for continuance.

[32] Lester contends that because he "may have had an interest in" the Bridgewater Property individually, his due process rights were violated when the trial court denied his motion to continue the Zoom hearing, at which he would like to

---

[3] On appeal, Lester also challenges the St. Joseph County trial court's jurisdiction over the Bridgewater Property, which is located in Elkhart County. Because Lester failed to raise the jurisdictional issue in the trial court, LeSEA argues waiver. Although waiver may be possible, our conclusion that LeSEA properly brought its action against Lester alone to reach property over which he has ownership makes any jurisdictional question concerning the Bridgewater Property moot.

have been "afforded an opportunity to present evidence on the issues[.]" Appellant's Br. at 11. He claims that the exhibits and documents before the trial court "were no substitute for a hearing that would have allowed [Lester] to call witnesses, offer documents, and cross examine" witnesses. *Id*. at 12.

[33] The decision to grant or deny a motion for a continuance rests within the sound discretion of the trial court, and we reverse only for an abuse of discretion. *Rowlett v. Vanderburgh Cnty. Off. of Fam. & Child.*, 841 N.E.2d 615, 619 (Ind. Ct. App. 2006), *trans. denied*. An abuse of discretion may be found in the denial of a motion for a continuance when the moving party has shown good cause for granting the motion. *Id.* To demonstrate an abuse of discretion, the "moving party must be free from fault and show that his rights are likely to be prejudiced by the denial" of the continuance. *Scott v. Crussen*, 741 N.E.2d 743, 746 (Ind. Ct. App. 2000), *trans. denied* (2001).

[34] LeSEA cites Indiana Appellate Rule 9(F)(3) and 9(F)(8)(a) and contends that Lester's motion to continue is not properly before us. LeSEA points out that when Lester began his appeal, he neither identified the July 28, 2023 order denying his motion to continue nor attached it. Rather, he identified and attached only the August 23, 2023 order. "Even if the spirit of the rule would require (and the better practice might have been for) [Lester] to mention both orders in his notice of appeal and attach a copy of both orders," LeSEA cites no persuasive authority for the proposition that Lester's failure forfeited his right to appeal the continuance issue that he raised in his brief. *In re Paternity of C.B.*, 112 N.E.3d 746, 750 (Ind. Ct. App. 2018), *trans. denied* (2019). Lester did

include the July 28, 2023 order in his appellant's appendix, and LeSEA addresses the substance of the issue on appeal.

[35] To recap, in mid-June 2023, Lester asked the trial court to set a hearing regarding attorney fees. On June 20, 2023, the trial court did so, scheduling the Zoom hearing for August 1, 2023. On June 21, 2023, Lester filed both an objection to LeSEA's motion for judgment lien against the Bridgewater Property and a motion requesting that the matter be set for hearing "no sooner than forty-five (45) days from the filing of this Motion, *with briefs and arguments on the issues* due ten (10) days before the hearing." Appellant's App. Vol. 2 at 154 (emphasis added). Approximately one week before the Zoom hearing, Lester moved for a continuance (claiming that he would be out of the country and unable to testify), and he filed briefs addressing the attorney fees and judgment lien issues. LeSEA filed its objection to Lester's motion for continuance and contended that time was of the essence due to the prospect of Lester filing bankruptcy. In the July 28, 2023 order denying Lester's motion for continuance, the trial court found that the hearing had been set more than a month previously, that it would be conducted via Zoom, and that it would consist of legal argument via counsel.

[36] To demonstrate that the trial court abused its discretion in denying the motion to continue the Zoom hearing, Lester had to show that he was free from fault and that his rights were likely to be prejudiced by the denial. When he made his original request for a hearing and when he reiterated the request, Lester did not ask for an evidentiary hearing. Accordingly, his motion for continuance, filed

one week before the Zoom hearing, was the first time he referenced possible testimony. Lester's failure to request an evidentiary hearing makes it difficult to show that he was free from fault. Moreover, in making its decision regarding the judgment lien, the trial court considered the briefs and attached exhibits as well as the arguments presented by counsel at the hearing. Exhibits included the warranty deed with Sarah's name scratched out,[4] Lester's mortgage application, and Lester's quitclaim deed from himself to Sarah and him as co-trustees of the Sumrall Trust, and the Sumrall Trust document. At no point did Lester suggest what, if any, additional admissible evidence would be relevant to the legal question presented. Thus, he has not shown that his rights were likely to be prejudiced by a denial of the continuance motion. Because Lester has not shown good cause for granting the continuance motion, we find no abuse of discretion in the trial court's denial of the motion.

[37]    Affirmed.


Bailey, J., and Pyle, J., concur.

---

[4] Regardless of who scratched out Sarah's name, the warranty deed that was recorded had only Lester's name.

ATTORNEY FOR APPELLANT

Philip E. Hesch
Hesch Law Office, LLC
Elkhart, Indiana

ATTORNEYS FOR APPELLEE

Louis T. Perry
Emily A. Kile-Maxwell
Faegre Drinker Biddle & Reath LLP
Indianapolis, Indiana